STATE OF MAINE
CUMBERLAND, ss

STATE OF MAINE
JUDICIAL AND ...
CLERK'S OFFICE

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-08-098

REC ... _7/8 2...

ROBERT FLAHERTY, et al.,
        Plaintiffs/Third Party Defendants

2009 JUL -8 P 12: 00

ORDER ON PLAINTIFFS'
AND THIRD PARTY
DEFENDANTS'
MOTIONS FOR
SUMMARY
JUDGMENT

v.

HELEN MUTHER et al.,
        Defendants/Third Party Plaintiffs

Before the Court is Plaintiffs/Third Party Defendants Robert Flaherty, Sheryl

Flaherty, Barbara Cotter, Joseph Cotter, Mary Arnold, Richard Raubeson, Kathleen

Raubeson, James L. Moody, Jr., Marjorie Moody, Alison Perkins as Trustee of Moody

Realty Trust, Paul Stewart, Melanie Stewart, Patricia Campbell, Joseph Hetrick, Eileen

Hetrick, Nancy Wulf and Norman Wulf as Trustees of Nancy N. Wulf Living Trust,

Steven McGrath and Elizabeth McGrath's motion for summary judgment against

Defendants/Third Party Plaintiffs, Helen Muther and Paul Woods, individually and in

their capacity as Trustees of the Buffett Coastal Trust, pursuant to M.R. Civ. P. 56. A

second motion for summary judgment is also before the Court. Plaintiffs/Third Party

Defendants Russell Pierce, Jacqueline Pierce, Paulette York, Todd Colpitts, Niamh

Colpitts, David House, Susan House, David Meagher, and Ellen Meagher bring this

motion. Together, the moving parties are referred to herein as "J-Lot owners" by virtue

of their ownership interests in property designated on a recorded plan starting with a

J". The Court considers these motions together due to the commonality of issues raised

in the motions.[1]

## BACKGROUND

In November 2005, Helen Muther and Paul Woods ("Muther and Woods") filed a complaint in this Court against what is now collectively known as the Broad Cove Shore Association (hereinafter "the Association"), docket number RE-05-169 ("the prior litigation"). In that case, Muther and Woods sought a declaratory judgment against the Association that it had "no legal right to access, cross, or use [Muther and Woods'] property in the walkway easement or any other location." RE-05-169 Pls.' Amend. Compl. ¶ 31(a). Muther and Woods also sought a permanent injunction against the Association "their agents, members, servants, employees, attorneys, and all persons in active concert or participation with it from using or claiming or asserting any right to use" Muther and Woods' property.[2] *Id.* ¶ 33. Muther and Woods also sought a declaratory judgment and a permanent injunction against Leslie B. Connolly ("Connolly").[3]

In a separate count, Muther and Woods sought damages for trespass and a declaratory judgment against Beth Ellen Hess ("Hess").[4] *Id.* ¶ 53. Muther and Woods alleged that Hess "overburdened the walkway easement by her use of the walkway

---

[1] The first motion for summary judgment was brought by both Plaintiffs and Third Party Defendants, but their statement of material facts is referred to herein as "Third Party Defendants' S.M.F." The statement of material facts filed by the other set of Plaintiffs/Third Party Defendants will be designated as "Plaintiffs/Third Party Defendants' S.M.F."

[2] The Plaintiffs' Amended Complaint describes the former iterations of the Association as one that consists of "'all the owners and spouses of owners of lots' laid out on seven different subdivision plans recorded at the Cumberland County Registry of Deeds, consisting of no less than 220 house lots." Pls.' Amend. Compl. ¶ 22.

[3] The Plaintiffs' Amended Complaint describes Connolly as "a resident of Cape Elizabeth, Maine and an owner of the real estate located at 23 Hunts Point Road, Cape Elizabeth, Maine and described in deed recorded at Cumberland County Registry of Deeds, Book 20502, Page 261." *Id.* ¶ 5. Connolly is not a J-Lot owner. *See id.* ¶ 37 (stating that Connolly owns Lot G-27).

[4] The Plaintiffs' Amended Complaint describes Defendant Hess as "a resident of Cape Elizabeth, Maine and an owner of the real estate located a 5 Masefield Terrace, Cape Elizabeth, Maine and described in deed recorded at Cumberland County Registry of Deeds, Book 17759, Page 172." *Id.* ¶ 4. Hess is a J-Lot owner. *See id.* ¶ 48 (stating that Hess owns Lot J-38).

2

easement to access land other than the intertidal zone adjacent to Lot J-46, namely land now or formerly of Holt." *Id.* ¶ 49. Muther and Woods asserted another trespass/overburdening claim against Hess based on her alleged "open invitation" to allow others to use the walkway easement. *Id.* ¶ 57. In this count, Muther and Woods sought a declaratory judgment that the walkway easement "is appurtenant only to those lots established by the 1970 Plan and the 1969 Plan and may be used only by the Owners and/or occupants of said lots, and that the walkway easement is limited to the Owners and/or occupants of the lots created and established by the 1970 Plan and the 1969 Plan and only for the purposes of access to the high water mark of Casco Bay in the area shown on the 1970 Plan, and not beyond." *Id.* ¶ 58(b).

On November 29, 2006, the parties participated in a judicial settlement conference. At the end of the day, the parties reached an agreement and put the details of the agreement on the record ("Settlement Agreement"). After the parties reached an impasse during the drafting of the stipulated judgment, this Court permitted Muther and Woods to amend their pleadings to include a count for breach of the Settlement Agreement. Thereafter, this Court granted summary judgment for Muther and Woods on the issue of the existence of an enforceable, albeit imperfect, Settlement Agreement. After the entry of this order, some but not all, of the individual J-Lot owners came forward and filed motions to join in the prior litigation and for this Court to reconsider its summary judgment order. By Order dated April 2, 2008, entitled "Order on All Pending Motions," the Court denied the motions for joinder, reconsideration and the objection to the transcript. The Court then ruled that the case was concluded.

Subsequently, while the Association appealed from the Court's September 14, 2007 grant of summary judgment for Muther and Woods and the Court's April 2, 2008 order concerning the transcript, a new action was filed by some, but not all, of the J-Lot

3

owners. In their answer, Muther and Woods counterclaimed and filed a third party complaint bringing all of the remaining J-Lot owners into the case.[5]

The Law Court affirmed this Court's grant of summary judgment and its decision the motions to intervene. *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 1, 968 A.2d 539, 540 (hereinafter *Muther I*).

## DISCUSSION

### I. Standard of Review

In a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party to decide whether the parties' statements of material facts and the referenced record material reveal a genuine issue of material fact. *Rogers v. Jackson*, 2002 ME 140, ¶ 5, 804 A.2d 379, 380 (citations omitted). The Court gives the party opposing summary judgment the benefit of any inferences that might reasonably be drawn from the facts presented. *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18, 22. If the record reveals no genuine issue of material fact then summary judgment is proper. *Id.* ¶ 6, 784 A.2d at 21. A genuine issue of material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial. *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179.

### II. Preliminary Issues

First, with the exception of Hess, none of the J-Lot owners were named parties in the prior litigation. *See* Third Party Defendants' Supp. S.M.F. ¶ 10, Opp. S.M.F. ¶ 10. Hess was named individually; she was not named as a representative of the Association or as a representative of other J-Lot owners. *See* Pls.' Amend. Compl. ¶ 4. Therefore,

---

[5] Joseph and Eileen Hetrick were added as third party defendants after they purchased a home from the Stewarts, a third party defendant already. David Sawicki and Diane Beem never responded to the Third Party Complaint and the clerk entered default against them.

4

the conclusion that the remaining J-Lot owners were not parties to the prior litigation is self evident given the pleadings in the prior litigation.[6]

Next, the summary judgment record clearly demonstrates that Muther and Woods' property is burdened by a 20-foot drainage and walkway easement in favor of the J-Lot owners. Third Party Defendants' Supp. S.M.F. ¶ 4, Opp. S.M.F. ¶ 4; Plaintiffs/Third Party Defendants S.M.F. ¶¶ 11-17, Opp. S.M.F. ¶¶ 11-17. It is similarly clear from the summary judgment filings that all issues regarding the scope of the J-Lot owners' easement rights, as well as permissible activities occurring on the area commonly referred to as Secret Beach cannot be resolved at summary judgment. This conclusion is consistent with the stipulation entered into by the parties at the trial management conference held on July 2, 2009.[7]

Some J-Lot owners also ask the Court to hold, as a matter of law, that Muther and Woods' boundary line extends no farther than the mean high water mark and that no other evidence, except the deeds and the recorded plans, is admissible to prove ownership. However, Muther and Woods present contrary evidence in the form of expert testimony by Donald R. Richards ("Richards"). Add'l S.M.F. ¶¶ 82-95. The Third Party Defendants themselves answer the question whether Muther and Woods' boundary line can be resolved at summary judgment. In denying paragraph 85, they state, "The location of the boundary is under dispute at [sic] to whether the easterly boundary of Lot J-46 is the top of the bank, the mean high water mark or the low water mark." Opp. Add'l S.M.F. ¶ 85 (internal citations omitted). Quite clearly, there are numerous genuine issues of material fact that require the fact-finder to choose between

---

[6] This conclusion, however, does not end the inquiry as to whether the J-Lot owners were privies of the Association and are thereby bound by the Settlement Agreement. This issue is addressed below.

[7] "The parties stipulate that the "J Lot" owners have the right to use the access way to get to the inter tidal zone for uses to which Defendants Helen Muther, Paul Woods and the Buffett Coastal Trust legally cannot object successfully." Stipulation dated July 2, 2009.

5

competing versions of the truth. Accordingly, the Court denies summary judgment insofar as it relates to Muther and Woods' boundary line.

## III.   Binding Effect of the Settlement Agreement

In their motions for summary judgment, the J-Lot owners preemptively raise the issue of whether Muther and Woods may present evidence and argument at trial that the J-Lot owners are bound by the Settlement Agreement. The J-Lot owners present two theories in support of this argument. The first involves the doctrine of offensive non-mutual (i.e. third party) collateral estoppel. The second is, in essence, a sufficiency of the evidence argument. Each is addressed in turn.

### A.   Claim Preclusion

"Collateral estoppel applies only when the issue that the party is to be precluded from re-litigating has been (1) actually litigated; (2) determined by a final and valid judgment and (3) the determination is essential to the judgment." *Society of Lloyd's v. Baker*, 673 A.2d 1336, 1341, n.6 (Me. 1996). Muther and Woods, as the parties resisting the application of collateral estoppel, have the burden of establishing that they are prejudiced by the application of collateral estoppel in this action. *See Van Houten v. Harco Constr.*, 655 A.2d 331, 333-34 (Me. 1995).

The Law Court has expressed a variety of concerns regarding third party collateral estoppel. *Hossler v. Barry*, 403 A.2d 762, 769 (Me. 1979) (discussing concerns such as prejudice to parties and the lack of judicial economy in this type of usage). Thus, third party collateral estoppel will not preclude the re-litigation of issues "unless it is shown that the judgment *necessarily involved* a determination of the fact sought to be included in the second suit." *Lalumiere v.*

6

*Miller*, 1998 ME 274, ¶ 7, 722 A.2d 46, 48 (emphasis added) (quoting *Susi v. Davis*, 133 Me. 354, 357, 177 A. 610, 612 (1935)).

The J-Lot owners argue that Muther and Woods are precluded from arguing that they are bound to the Settlement Agreement. For this proposition, the J-Lot owners rely on the following statement from this Court's Order dated April 2, 2008:

> While the settlement agreement affects the rights of J-Lot owners, including the moving parties, derived from their membership in the Association, it does not affect any individually-deeded rights of any J-Lot owners not a party to this suit.

Order on All Pending Motions dated April 2, 2008.[8]

This Court's April 2, 2008 Order favored Muther and Woods as did the Law Court's decision affirming that Order. Muther and Woods had no incentive to contest, litigate or appeal the single sentence in the April 2, 2008 Order that the J-Lot owners now rely upon. Additionally, the Order itself expressly provided that "[a]ny disputes about the meaning of the terms of the settlement agreement *or who is bound thereby* are to be brought in a separate action." Order dated April 2, 2008 at 5 (emphasis added). For these reasons, the question of whether J-Lot owners are bound to the Settlement Agreement was not "necessarily involved" in the prior litigation.

The Court holds that Muther and Woods are not precluded, on collateral estoppel grounds, from arguing in this action that the J-Lot owners are bound by the Settlement Agreement. Next, the Court addresses the question of whether the J-Lot owners were, as a matter of law, privies of the Association during the

---

[8] The Law Court ostensibly agreed with this general principle inasmuch as it stated "the settlement agreement, by its terms, is binding only upon the individually named parties and Association members. . . . [T]he resulting judgment does not impair the ability of unnamed individuals to enforce rights that are not derived from Association membership." *Muther I*, 2009 ME 37, ¶ 9, 968 A.2d at 542.

7

prior litigation, and therefore bound by the terms of the Settlement Agreement.

### B.     Privity

The J-Lot owners argue that the Settlement Agreement entered into in the prior

litigation does not affect the individual property rights of the J-Lot owners who were

not parties to that action. The J-Lot owners not involved in the prior litigation ask this

Court to rule, as a matter of law, that they cannot be bound by the Settlement

Agreement because they were not parties. The question of whether the individual J-Lot

owners were parties in the prior litigation was answered in the negative above.

Nevertheless, there is still a question of whether these individuals were privies of the

Association in the prior litigation such that they are bound by the Settlement

Agreement. Quite obviously, the Settlement Agreement binds Hess and Connolly

because they were individually named defendants in the prior litigation.

There are a number of circumstances where a non-party can be bound by a

settlement or a judgment. *See* Restatement (Second) Judgments §§ 41-42 (citing

circumstances and the exceptions thereto).[9] In *Crane v. Commissioner of Department of*

---

[9] Restatement section 41 states:

(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

    (a) The trustee of an estate or interest of which the person is a beneficiary; or

    (b) Invested by the person with authority to represent him in an action; or

    (c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

    (d) An official or agency invested by law with authority to represent the person's interests; or

    (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

(2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.

Restatement (Second) Judgments § 41.

*Agriculture*, 602 F. Supp. 280 (D. Me. 1985) the court answered the question of whether a party can be bound by a judgment in a prior case by virtue of their involvement in that prior case.[10] The *Crane* court set out five factors to consider, including:

> (1) the adequacy of representation; (2) whether individual members of an association have interests which conflict with those of the association; (3) the degree to which the association is involved in the activities of its individual members; (4) whether, and to what extent, individual members participated in earlier litigation involving the association; and (5) whether, and to what extent, individual members have authorized the association to represent their individual interests.

*Id.* at 285-86. This determination "usually turns upon whether the members consented to or otherwise authorized the association or organization to represent their individual interests." *Id.* at 286.

As to the first *Crane* factor, no one could question the zealous advocacy of counsel in the prior litigation. However, despite the numerous emails and

---

Restatement section 42 states the general exceptions to this rule:

(1) A person is not bound by a judgment for or against a party who purports to represent him if:

(a) Notice concerning the representation was required to be given to the represented person, or others who might act to protect his interest, and there was no substantial compliance with the requirement; or

(b) The subject matter of the action was not within the interests of the represented person that the party is responsible for protecting; or

(c) Before rendition of the judgment the party was divested of representative authority with respect to the matters as to which the judgment is subsequently invoked; or

(d) With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked; or

(e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.

Restatement (Second) Judgments § 42(1).

[10] In *Crane*, individual milk producers were held to be in privity with the Maine Milk Producers, Inc. (an industry association) who had previously litigated the issues of constitutionality of the Maine Milk Pool Act. 602 F. Supp. at 284.

9

communications between various J-Lot owners and Association members involved in the prior litigation, it is undisputed that at the time of the prior litigation some J-Lot owners were not members of the Association. Third Party Defendants' Supp. S.M.F. ¶ 16, Opp. S.M.F. ¶ 16. Additionally, no J-Lot owner, with the exception of Hess, attended the judicial settlement conference with Justice Bradford. Third Party Defendants' Supp. S.M.F. ¶ 19, Opp. S.M.F. ¶ 19. In fact, J-Lot owners were not independently represented by counsel until after the grant of summary judgment when they sought to intervene.

Next, the Court considers the interests of the Association versus the J-Lot owners. The two interests are different and, in fact, divergent. At stake in the prior litigation for the Association and its members was the right to access Secret Beach from Muther and Woods' property. For example, if the prior litigation proceeded to trial the fact-finder could have found that the Association failed to meet one of any number of the elements necessary for a prescriptive easement claim. However, the same was not true for J-Lot owners. Their right to access Secret Beach was not, and is not, dependent on a purported prescriptive use. Rather, the J-Lot owners' easement rights are derived from their deeds and the plan references. Thus, the J-Lot owners' ability to access the waterfront was never at issue or in jeopardy in the prior litigation. Indeed, the pleadings in the prior litigation support this view. *See e.g.*, RE-05-169, Pls.' Amend. Compl. ¶ 58(b) (stating that the walkway easement "is appurtenant only to those lots established by the 1970 Plan and the 1969 Plan and may be used only by the Owners and/or occupants of said lots, and that the walkway easement is limited to the Owners and/or occupants of the lots created and established by the 1970 Plan and the 1969 Plan and only for the purposes of access to the high water mark of Casco Bay in the area shown on the 1970 Plan, and not beyond"). *Cf. Dep't of Human Servs. ex rel. Boulanger v.*

10

*Comeau*, 663 A.2d 46, 48 (Me. 1995) (discussing differing interests of a mother and a child in a paternity action such that a child is not in privity with the mother for purposes of *res judicata*) (citing Restatement (second) of Judgments § 41); *Stitham v. Henderson*, 2001 ME 52, ¶¶ 8-9, 768 A.2d 598, 601 (discussing differing interests of a biological mother and a biological father in a paternity action and holding that a non-party biological father's later brought claims were not *res judicata*).

Next, we consider the Association's involvement with J-Lot owners. No facts are specifically identified that demonstrate its involvement beyond that of a neighborhood association to which J-Lot owners were permitted to become members.

Next, the Court considers the extent of the J-Lot owners' involvement in the prior litigation. The Court accepts as true that certain J-Lot owners had extensive involvement with the Association during the prior litigation as evidenced by the hundreds of emails sent to and from the Association; that many J-Lot owners contributed between $500 and $750 to the legal defense; and that several J-Lot owners made solicitations for the Association's litigation fund.

Finally, we consider the final *Crane* factor regarding authorization. There is no evidence before the Court, beyond the J-Lot owners "applause", regarding the J-Lot owners' authorization to have their individual interests represented during the prior litigation. In fact, the motions to intervene strongly suggest that they did not authorize a settlement that would affect their individual rights.

For the foregoing reasons, viewing the facts in the light most favorable to Muther and Woods as the non-moving parties, the Court holds that the record evidence fails to establish a genuine issue of material fact regarding the issue of whether the Association, Hess, and/or Connolly were acting as privies of J-Lot owners in the prior litigation. The Court holds that the evidence is insufficient, as a matter of law, to support a finding

11

of privity. Therefore, any evidence related to this claim is hereby excluded from trial.

Therefore, the entry is:

> Plaintiffs/Third Party Defendants' motion for summary judgment is GRANTED insofar as it seeks a declaration that the J-Lot owners, with the exception of Beth Ellen Hess, were not parties to or bound by the settlement agreement reached in the prior litigation.
>
> Plaintiffs/Third Party Defendants' motion for summary judgment is DENIED insofar as it seeks a declaration of the scope of the J-Lots owners' rights to use the drainage and walkway easement and Secret Beach.
>
> Plaintiffs/Third Party Defendants' motion for summary judgment is DENIED insofar as it relates to Muther and Woods' boundary lines.
>
> The clerk shall incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated at Portland, Maine this ___8th___ day of ___July_____, 2009.

_____
Robert E. Crowley
Justice, Superior Court

12

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
-----------------------------------------------------------------------------
SEL VD                            REPRESENTATION TYPE       DATE
01 0000003911 ATTORNEY:BITHER, STEPHEN D
ADDR:23 AMHERST STREET PO BOX 6762 PORTLAND ME 04103
     F FOR:TODD COLPITTS                PL        RTND    04/22/2008
     F FOR:NIAMH COLPITTS               PL        RTND    04/22/2008
     F FOR:RUSSELL PIERCE               PL        RTND    04/22/2008
     F FOR:PAULETTE YORK                PL        RTND    04/22/2008
     F FOR:JACQUELINE PIERCE            PL        RTND    04/22/2008
     F FOR:SUSAN HOUSE                  3RD P DEF RTND    07/01/2008
     F FOR:ELLEN MEAGHER                3RD P DEF RTND    07/01/2008


                         *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
---------------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
01 0000003911 ATTORNEY:BITHER, STEPHEN D
ADDR:23 AMHERST STREET PO BOX 6762 PORTLAND ME 04103
     F FOR:DAVID MEAGHER                    3RD P DEF    RTND    07/01/2008
     F FOR:DAVID HOUSE                      3RD P DEF    RTND    07/01/2008


02 0000002982 ATTORNEY:KANY, WILLIAM
ADDR:199 Main Street PO Box 1179 SACO ME 04072
     F FOR:PETER CONNOLLY                   3RD P DEF    RTND    07/07/2008


03 0000007848 ATTORNEY:MCKEE, WALTER
ADDR:227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
     F FOR:HELEN MUTHER                     DEF          RTND    04/23/2008


                              *More Attorneys*
              Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
----------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE       DATE
03 0000007848 ATTORNEY:MCKEE, WALTER
ADDR:227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
     F FOR:PAUL WOODS                     DEF       RTND   04/23/2008
     F FOR:BUFFET COASTAL TRUST           DEF       RTND   04/23/2008


04 0000001027 ATTORNEY:MCNABOE, THOMAS R
ADDR:13 SEA COVE ROAD CUMBERLAND ME 04110
     F FOR:ROBERT FLAHERTY                PL        RTND   04/22/2008
     F FOR:BARBARA COTTER                 PL        RTND   04/22/2008




                        *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
--------------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
04 0000001027 ATTORNEY:MCNABOE, THOMAS R
ADDR:13 SEA COVE ROAD CUMBERLAND ME 04110
     F FOR:JOSEPH COTTER                   PL          RTND   04/22/2008
     F FOR:MARY ARNOLD                     PL          RTND   04/22/2008


05 0000002691 ATTORNEY:PARKINSON, DURWARD
ADDR:62 PORTLAND RD, KENNEBUNK ME 04043
     F FOR:BETH ELLEN HESS                 3RD P DEF   RTND   07/03/2008
     F FOR:ROBERT HESS, JR                 3RD P DEF   RTND   12/03/2008



                        *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                       CASE #:PORSC-RE-2008-00098
------------------------------------------------------------------------
SEL VD                                REPRESENTATION TYPE      DATE
06 0000003649 ATTORNEY:SPARKS, ANDREW
ADDR:ONE MONUMENT WAY PORTLAND ME 04101
    F FOR:THE 1962 BROAD COVE SHORE ASSOCIATION    3RD P DEF   RTND   06/25/2008


                              *More Attorneys*
              Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                        CASE #:PORSC-RE-2008-00098
------------------------------------------------------------------------------
SEL VD                                    REPRESENTATION TYPE      DATE
01 0000003649 ATTORNEY:SPARKS, ANDREW
ADDR:ONE MONUMENT WAY PORTLAND ME 04101
     F FOR:THE 1962 BROAD COVE SHORE ASSOCIATION    3RD P DEF    RTND   06/25/2008
     F FOR:THE 2005 BROAD COVER SHORE ASSOCIATION   3RD P DEF    RTND   06/25/2008
     F FOR:THE MERGED BROAD COVE SHORE ASSOCIATION  3RD P DEF    RTND   06/25/2008
     F FOR:NEW BROAD COVE SHORE ASSOCIATION         3RD P DEF    RTND   06/25/2008

02 0000009291 ATTORNEY:FRAME, GREGG R
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
     F FOR:JAMES L MOODY, JR                        3RD P DEF    RTND   07/21/2008


                         *More Attorneys*
             Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
------------------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
02 0000009291 ATTORNEY:FRAME, GREGG R
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
     F FOR:MARJORIE MOODY                  3RD P DEF    RTND    07/21/2008
     F FOR:PAUL STEWART                    3RD P DEF    RTND    07/21/2008
     F FOR:PATRICIA CAMPBELL               3RD P DEF    RTND    07/21/2008
     F FOR:STEPHEN MCGRATH                 3RD P DEF    RTND    07/21/2008
     F FOR:NORMAN WULF (TRUSTEE)           3RD P DEF    RTND    07/21/2008
     F FOR:NANCY WULF                      3RD P DEF    RTND    07/21/2008
     F FOR:ELIZABETH MCGRATH               3RD P DEF    RTND    07/21/2008


                         *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
-----------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
02 0000009291 ATTORNEY:FRAME, GREGG R
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
     F FOR:ROBERT HESS, JR              3RD P DEF    RTND   07/21/2008
     F FOR:MELANIE STEWART              3RD P DEF    RTND   07/21/2008
     F FOR:ALISON PERKINS (TRUSTEE)     3RD P DEF    RTND   07/21/2008


03 0000009353 ATTORNEY:BILLINGS, JAMES A
ADDR:227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
     F FOR:PAUL WOODS                   DEF          RTND   11/05/2008




                        *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
--------------------------------------------------------------------------
SEL VD                                REPRESENTATION TYPE      DATE
04 0000009872 ATTORNEY:DUCHETTE, ANDRE G
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
    F FOR:JAMES L MOODY, JR              3RD P DEF    RTND   07/21/2008
    F FOR:MARJORIE MOODY                 3RD P DEF    RTND   07/21/2008
    F FOR:ALISON PERKINS (TRUSTEE)       3RD P DEF    RTND   07/21/2008
    F FOR:PAUL STEWART                   3RD P DEF    RTND   07/21/2008



                         *More Attorneys*
           Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
-----------------------------------------------------------------------------
SEL VD                                 REPRESENTATION TYPE      DATE
01 0000009872 ATTORNEY:DUCHETTE, ANDRE G
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
    F FOR:PAUL STEWART                      3RD P DEF    RTND   07/21/2008
    F FOR:MELANIE STEWART                   3RD P DEF    RTND   07/21/2008
    F FOR:THE MERGED BROAD COVE SHORE ASSOCIATION  3RD P DEF    RTND   06/25/2008
    F FOR:NEW BROAD COVE SHORE ASSOCIATION  3RD P DEF    RTND   06/25/2008
    F FOR:THE 2005 BROAD COVER SHORE ASSOCIATION  3RD P DEF    RTND   06/25/2008
    F FOR:THE 1962 BROAD COVE SHORE ASSOCIATION  3RD P DEF    RTND   06/25/2008
    F FOR:PATRICIA CAMPBELL                 3RD P DEF    RTND   07/21/2008


                        *More Attorneys*
        Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                    CASE #:PORSC-RE-2008-00098
--------------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
01 0000009872 ATTORNEY:DUCHETTE, ANDRE G
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
     F FOR:STEPHEN MCGRATH              3RD P DEF    RTND   07/21/2008
     F FOR:ELIZABETH MCGRATH            3RD P DEF    RTND   07/21/2008
     F FOR:NANCY WULF                   3RD P DEF    RTND   07/21/2008
     F FOR:NORMAN WULF (TRUSTEE)        3RD P DEF    RTND   07/21/2008
     F FOR:ROBERT HESS, JR              3RD P DEF    RTND   07/21/2008

02 0000004209 ATTORNEY:HADIARIS, JOSHUA D
ADDR:199 Main Street PO Box 1179 SACO ME 04072
     F FOR:PETER CONNOLLY               3RD P DEF    RTND   01/15/2009


          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.

ROBERT FLAHERTY VS HELEN MUTHER
UTN:AOCSsr  -2008-0042508                        CASE #:PORSC-RE-2008-00098
------------------------------------------------------------------------------
SEL VD                                REPRESENTATION TYPE      DATE
01 0000009872 ATTORNEY:DUCHETTE, ANDRE G
ADDR:4 MILK ST., SUITE 103 PORTLAND ME 04101
     F FOR:STEPHEN MCGRATH               3RD P DEF    RTND   07/21/2008
     F FOR:ELIZABETH MCGRATH             3RD P DEF    RTND   07/21/2008
     F FOR:NANCY WULF                    3RD P DEF    RTND   07/21/2008
     F FOR:NORMAN WULF (TRUSTEE)         3RD P DEF    RTND   07/21/2008
     F FOR:ROBERT HESS, JR               3RD P DEF    RTND   07/21/2008

02 0000004209 ATTORNEY:HADIARIS, JOSHUA D
ADDR:199 Main Street PO Box 1179 SACO ME 04072
     F FOR:PETER CONNOLLY                3RD P DEF    RTND   01/15/2009



         Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.

STATE OF MAINE
CUMBERLAND, ss



SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-08-098

ROBERT FLAHERTY, et al.,
      Plaintiffs/Third Party Defendants

2009 JUL 30 P 12: 49

v.

JUDGMENT

HELEN MUTHER et al.,
      Defendants/Third Party Plaintiffs

This case arises out of a dispute among various parties living in the Broad Cove neighborhood in Cape Elizabeth, Maine concerning an easement over property owned by Defendants / Third Party Plaintiffs Paul Woods and Helen Muther ("Woods and Muther"). Woods and Muther own the servient estate. The holders of the dominant estate – a subset of owners of property in the neighborhood – have sought a declaratory judgment, *inter alia*, with respect to the ownership of property in and around the easement and with respect to the rights and responsibilities of both the dominant and servient estate holders.

As part of what is expected to be a multiple-stage trial process in this case, this Court held an evidentiary hearing from July 14, 2009 through July 23, 2009 at which testimony was taken from Woods and Muther as well as many of the Plaintiffs and Third Party Defendants (collectively called the "J-Lot owners" because of the "J" designator on certain plans specifying the lot they own) and other witnesses including expert witnesses. This Court addresses and makes findings of fact and conclusions of law in this first stage of this case on the issues as they relate to ownership of the property over which the easement lies as well as the immediate, surrounding areas,

including the intertidal zone and the issues as they relate to use of the easement itself and a gate that has been placed at the top of the easement.[1]

## BACKGROUND

### I. Parties

In 2008, Plaintiffs Robert Flaherty, Barbara Cotter, Joseph Cotter, Mary Arnold, Todd Colpitts, Niamh Colpitts, Russell Pierce, Jacqueline Pierce and Paulette York filed suit against Helen Muther, Paul Woods, and the Buffett Coastal Trust. Woods and Muther answered, counterclaimed and filed a third party complaint bringing all of the remaining J-Lot owners into the case. Specifically, the Third Party Defendants are James and Marjorie Moody, Alison Perkins, Paul and Melanie Stewart, Patricia Campbell, Beth and Robert Hess, Jr., Stephen and Elizabeth McGrath, Richard and Kathleen Raubeson, David Sawicki, Diane Beem, Sheryl Flaherty, Peter Connolly, and Nancy and Norman Wulf. Since then, Joseph and Eileen Hetrick were added as Third Party Defendants after they purchased a J-Lot from the Stewarts. All of the original plaintiffs were also renamed as Third Party Defendants. The J-Lot owners who are parties herein are similarly situated, a) because of the provisions in their deeds regarding the same drainage and walkway easement and b) because they have all been sued in the same complaint by the same parties seeking the same remedies.

### II. Pleadings

The following claims, counterclaims and third party claims are addressed in this non-jury stage of the litigation: Plaintiffs' Count I (Declaratory Judgment) and Count II

---

[1] Top of the easement refers to the most westerly end of the 20' drainage and walkway easement, which is perpendicular to Running Tide Road.

2

(Injunctive Relief);[2] Woods and Muther's Counterclaim Count II (Declaratory Judgment), Counterclaim Count III (Overburdening of Easement) and Third Party Plaintiffs' Complaint Count VI (Overburdening of Easement);[3] Third Party Defendants' Counterclaim Count VI (Prescriptive easement to the intertidal zone and above the high-water mark);[4] and finally, the State of Maine's claim for public trust rights in the intertidal zone in front of the Woods and Muther property.

At the next stage in the litigation a jury will decide the following claims, counterclaims, and third party complaints: Plaintiffs' Count III (Damages),[5] Third Party Defendants' Counterclaims Count I (Nuisance), Count II (Harassment), Count III (Invasion of Privacy), Count IV (Tortious Interference with a Prospective Economic Advantage);[6] Raubeson's Counterclaims Count I (Nuisance), Count II (Harassment), Count III (Invasion of Privacy), Count IV (Tortious Interference with a Prospective Economic Advantage); and finally, Woods and Muther's Third Party Complaint Count I (Breach of Indemnification), Count II (Fraud), Count III (Breach of Implied Warranty of Authority), and Count V (Trespass).

## III. Stipulation

The framework of the trial and the Court's decision is based upon the stipulation entered into by the parties on July 2, 2009. The parties have stipulated that the J-Lot

---

[2] At closing argument, Plaintiffs' counsel conceded that their claim based on the Public Trust in Intertidal Land Act, 12 M.R.S. §§ 571-573, was not pursued at trial due to the Law Court's prior holding of the statute as unconstitutional in *Bell v. Town of Wells*, 557 A.2d 168, 177 (Me. 1989) (*Bell II*), despite it remaining "on the books."

[3] Woods and Muther's Third Party Complaint Count IV (Declaratory Judgment) regarding the issue of whether the J-Lot owners are bound by the settlement agreement entered into during the prior litigation was resolved in this Court's Summary Judgment Order dated July 8, 2009. In this Order, "Plaintiffs/Third Party Defendants' motion for summary judgment [was] GRANTED insofar as it [sought] a declaration that the J-Lot owners, with the exception of Beth Ellen Hess, were not parties to or bound by the settlement agreement reached in the prior litigation." Order dated July 8, 2009.

[4] At closing argument, Third Party Defendants' counsel conceded that they had not presented evidence to establish Counterclaim Count VII (Dedication). Consequently, the Court does not address this counterclaim herein.

[5] Count IV (Public Trust) is resolved. *See supra* note 2.

[6] Counterclaim Count V (Public Trust) is resolved. *See supra* note 2.

3

owners "have the right to use the access way to get to the inter tidal zone for uses to which Defendants Helen Muther, Paul Woods and the Buffett Coastal Trust legally cannot object successfully."

## IV. Prior Litigation/Settlement Agreement

The prior litigation and subsequent settlement reached regarding the same drainage and walkway easement at issue is this case is worthy of brief mention. As stated in greater detail in this Court's Summary Judgment Order dated July 8, 2009, Woods and Muther initiated an action against what is now collectively known as the Broad Cove Shore Association (hereinafter "the Association"), docket number RE-05-169 ("the prior litigation"). The Association is comprised of approximately 243 householders located in and around the Broad Cove portion of Cape Elizabeth. Some Association members are also owners of J-Lots. Association members did not have any deeded rights to use the easement. Rather, in the prior litigation the Association asserted rights based on prescriptive use. Ultimately, the parties to the prior litigation entered into a settlement agreement, which granted Association members rights to use the drainage and walkway easement under certain agreed to conditions (e.g., time of day restrictions) and also gave Woods and Muther authority to erect a gate with electronic key card access at the top of the easement. Woods and Muther began construction of the gate after this Court entered its final order in that matter on April 2, 2008. The parties ultimately appealed that order as well as the Court's grant of summary judgment. The Law Court affirmed both decisions. *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 1, 968 A.2d 539, 540.

## V. Findings of Fact

After hearing all of the evidence, the Court makes the following findings of fact:

4

1. Mary Arnold is the owner of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 13051 Page 185.

2. Todd and Niamh Colpitts are the owners of certain real property located on Masefield Terrace in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 25728 Page 81.

3. Barbara Cotter is the owner of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 18538 Page 257.

4. Robert and Sheryl Flaherty are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 15892 Page 245.

5. David and Susan House are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 12046 Page 273.

6. David and Ellen Meagher are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 18807 Page 282.

7. Jacqueline and Russell Pierce are the owners of certain real property located on Masefield Terrace in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 14775 Page 272.

8. Richard and Kathleen Raubeson are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 13857 Page 267.

9. Paulette York is the owner of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 25386 Page 167.

10. Joseph and Eileen Hetrick are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 26310 Page 134.

11. Patricia Campbell is the owner of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 24095 Page 240.

12. James and Marjorie Moody are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 15555 Page 17.

13. Alison Perkins is the owner of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 9906 Page 186.

14. Paul and Melanie Stewart are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 24158 Page 34.

15. Robert and Beth Ellen Hess were formerly the owners of certain real property located on Masefield Terrace in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 17759 Page 172.

16. Stephen and Elizabeth McGrath are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 12882 Page 323.

17. Nancy and Norman Wulf, as Trustees under the Nancy N. Wulf Living Trust, are the owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 25766 Page 217.

18. Each of the parties listed in 1 through 17 have deeds that make a reference to subdivision plans specifying the lot they own. Exs. 2 & 3. Throughout the trial, the parties relied primarily on the plan approved by the Cape Elizabeth Planning Board on April 16, 1970, and recorded in the Cumberland County Registry of Deeds in Plan Book 83, Page 6 (hereinafter "the 1970 Plan"). Ex. 3. The Court refers exclusively to the 1970 Plan in this decision.

19. Paul Woods and Helen Muther are Trustees of the Buffett Coastal Trust, and as such are owners of certain real property located on Running Tide Road in Cape Elizabeth, Maine, as the said real property is described in a deed recorded in the Cumberland County Registry of Deeds in Book 21048, Page 85. The Woods and Muther property is a "J-lot," similar to the other J-Lots because it contains a reference to the 1970 Plan. It is Lot J-46.

20. The 1970 Plan contains a layout of the lots in the subdivision, with areas indicated for easements and rights of way.

6

21. The 1970 Plan designates an area across Lot J-46 (which currently belongs to Woods and Muther) as "20' Drainage and Walkway Easement." The deed to Woods and Muther for Lot J-46 states: "This conveyance is made subject, however, to the drainage and walkway easements shown on said plan."

22. The 1970 Plan does not contain any restrictions on the uses of the drainage and walkway easement, such as numbers of persons or times of day for use. It does not provide for a gate or surveillance equipment. It does not contain any restrictions on the uses and activities in the intertidal zone for people using the easement.

23. The "drainage" portion of the easement was further described and delineated in a deed from I. Alan Balfour and Isabel S. Balfour to the Town of Cape Elizabeth, dated April 23, 1970, and recorded in the Cumberland County Registry of Deeds in Book 8556, Page 751. The deed granted to the Town of Cape Elizabeth the right to use the easement for drainage purposes, and provided "no building or any kind of permanent structure shall be erected on such strip by the Grantors, their heirs and assigns."

24. The intertidal area and some sections of the upland area at the end of the drainage and walkway easement have become popularly known as "Secret Beach."

25. Lot J-46 is bounded on the south by land now or formerly of a Dr. William Holt, who is not a party to this action. Unlike the properties of the parties herein, Dr. Holt's property is not a J-Lot.

26. Mary Arnold has gone through the drainage and walkway easement on Lot J-46 and used Secret Beach regularly between 1985 and 1995.

27. Mary Arnold was not challenged by any person until 2004 for the uses that she made of the beach area.

28. Norman Wulf regularly used the drainage and walkway easement and the beach from the early 1970s through 2008 and ongoing. He was a guest, and a family member of the prior owners of the property. He was not challenged or otherwise prevented from using the beach during his time of use. Both Norman Wulf and his wife, Nancy Wulf, used the intertidal and the upland areas of Secret Beach. He is now a trustee of the trust that owns a J-Lot.

29. Robert Flaherty regularly visited the beach area for many years, at least since 1969. He has used the beach area for general recreational purposes during that time. He acquired a J-Lot in December 1999.

30. Bruce Balfour is the son of the developer I. Alan Balfour. Bruce Balfour used the intertidal zone of Secret Beach from 1969 through the early 1970s, for recreational activities. He was not challenged by the owner of the intertidal zone during that time.

7

31. Evidence from Robert Flaherty, Bruce Balfour, Nancy Wulf, Norman Wulf, and Mary Arnold shows usage, since 1969, of the intertidal zone of Secret Beach in front of Lot J-46 for recreational uses such as walking, swimming, reading, sitting, and similar activities.

32. Other J-Lot owners have regularly used the easement to access Secret Beach for recreational purposes, without being interfered with or challenged before 2004.

33. Several individuals, including J-Lot owners, went to the beach area and had bonfires and parties. None of the individuals were challenged by any other persons during their period of usage before 2004.

34. J-Lot owners used the beach area during the period between 1969 and 2008 for many purposes, including sunbathing, walking, throwing stones in the water, swimming, picnicking, in addition to fishing and navigating. There was no evidence of fowling on the beach.

35. No signs or restrictions on access were posted at the entrance to the easement until 2005.

36. Signs that were posted in 2005 restricted access to persons who were not J-Lot owners.

37. From 2005 to the present, Mr. Woods has challenged, on different occasions, individual J-Lot owners and their family members who were using their right of access through the drainage and walkway easement.

38. From 2005 to the present, Mr. Woods has confronted individuals, including J-lot owners who wished to use the easement and the beach.

39. Mr. Woods testified that he did not tell J-Lot owners that they could only fish, fowl or navigate in the intertidal zone. This testimony is not credible. Mr. Woods has consistently asserted that the easement is limited to "walking access to the intertidal zone for fishing, fowling and navigation." *See e.g.,* Ex. 36.

40. From the time that he moved into the property in 1999, prior to owning it, Mr. Woods has taken photographs of individuals who were using the easement and the beach area.

41. Mr. Woods and Ms. Muther have been hyper-vigilant about monitoring the use of the easement and of Secret Beach.

42. Most of the disturbances, and all of the criminal activity observed by Woods and Muther at Secret Beach were by unknown teenagers and others, not by J-Lot owners or their families.

43. Mr. Woods intended to change the use of the easement and intertidal zone when he acquired ownership of Lot J-46 in 2004.

8

44. Some J-Lot owners are frightened by the behavior of Mr. Woods in his confrontation of individuals at the easement area. They have limited their use of the easement and the beach out of aversion to confrontation.

45. In May of 2008, Mr. Woods erected a gate near the top of the easement area; and he erected a fence across the entrance to the easement area.

46. The purpose of erecting the gate was not to exclude J-Lot owners from accessing the easement. The gate was erected after the settlement agreement reached in the prior litigation with the Association and is consistent with that agreement.

47. As a result of some of the confrontations between individuals attempting to assert their rights in the easement and Mr. Woods, Mr. Woods called the Cape Elizabeth Police several times.

48. Mr. Woods did not obtain the consent of the individual J-Lot owners prior to constructing the gate.

49. Mr. Woods has proposed a system for the use of the drainage and walkway easement via an electronic gate and card system, which would be under his control.

50. Woods and Muther would be the sole persons responsible for activating and deactivating the electronic key cards.

51. Several J-lot owners are concerned about whether Mr. Woods would abuse the authority of controlling the gate.

52. The electronic gate system, like any electronic gate system, is subject to failures in operation.

53. Mr. Woods installed an electronic surveillance camera system on the drainage and walkway easement, without the consent of the individual J-Lot owners.

54. Most of the J-Lot owners have expressed concern about the need for the surveillance system and about the past and current use of the photographs obtained through the surveillance system.

55. Mr. Woods installed a system of motion detecting floodlights around the easement area, without the consent of the individual J-Lot owners.

56. Most of the J-Lot owners would prefer not to have the floodlights directed onto the easement.

57. Several of the J-Lot owners would like the ability to use the walkway easement and the beach at any time of the day or night; and they do not wish to have restrictions on the times of day when they can access and use the beach. For example, some J-Lot owners would like to fish at night.

9

58. There is no evidence that any owner of Lot J-46 prior to Woods and Muther either restricted access to any J-Lot owner through the easement or restricted access or usage on the beach during their time of ownership.

59. Woods and Muther resided in the house on Lot J-46 for several years prior to their acquiring ownership of the real estate. During their period of residence, they had the opportunity to observe the activity of individuals, including J-Lot owners, who were using the beach for recreational purposes. They also observed J-Lot owners using portions of the upland portion of Dr. Holt's land.

60. Woods and Muther have attempted to prevent individuals, including J-Lot owners, from entering onto the upland portion of Dr. Holt's property after they have crossed through the drainage and walkway easement.

61. The eastern boundary of Lot J-46 is the mean high water mark.

62. The owners of Lot J-46 do not own easterly of the mean high water mark.

63. Dr. Holt has owned the real estate to the south of the Woods and Muther property since 1987. About 50% to 60% of Secret Beach is in front of the Holt property.

64. There is a large pile of rocks at the end of the easement, and this pile has made access to the intertidal zone difficult for some individual J-lot owners or members of their families. This pile of rocks was placed in the easement by the Town of Cape Elizabeth for drainage purposes. Neither Mr. Woods nor Ms. Muther had any role in the placement of the rocks by the Town. As a result of the placement of the rocks by the Town, it is much more difficult for the J-Lot owners to get to the intertidal zone without trespassing on Dr. Holt's property.

65. There are various ways to physically access Secret Beach. Secret Beach may be accessed via the drainage and walkway easement, via Dr. Holt's property, via Woods and Muther's property, via the Raubeson's property, from the shoreline either north from Shore Acres or south via Hannaford Cove, as well as by the sea. Some of these avenues of access would involve a trespass.

66. It is very difficult to decipher when one is in the intertidal zone versus above the mean high-water mark when utilizing Secret Beach.

67. It is a very complex, highly technical and expensive undertaking to determine with precision where the mean high-water mark lies.

10

## VI. Historical Use

### A. Creation of the Drainage and Walkway Easement

The J-Lot owners' rights of access and use of Secret Beach through the drainage and walkway easement are by virtue of references to recorded subdivision plans. Therefore, the J-Lot owners have an "easement by implication based upon estoppel." *Callahan v. Ganneston Park Dev. Corp.*, 245 A.2d 274, 278 (Me. 1968). "When a conveyance expressly refers to a plan, that plan becomes a part of the deed, with the same force and effect as if copied into the deed, and is subject to no other explanation by extraneous evidence than if all the particulars of the description had been actually inserted in the body of the deed." *Bradstreet v. Bradstreet*, 158 Me. 140, 146 (1962).

### B. Boundary of Lot J-46

The next historical issue is the easterly boundary of the Woods and Muther property. The issue is whether Woods and Muther (a) have title to any land below the "top of bank," and/or (b) have title to the area between mean high water and mean low water (i.e. the intertidal zone). "The existence and nature of particular boundaries is a question of law and the location of those boundaries is a question of fact." *Eaton v. Town of Wells*, 2000 ME 176, ¶ 19, 760 A.2d 232, 240. Construction of the language of a deed is a question of law. *Id.*

The 1970 Plan is referenced in Woods and Muther's deed and describes the boundaries of the lot they own, Lot J-46. The deeds and plans in all parties' chains of title make clear that the easterly boundary of Lot J-46 is the mean high water mark of the Atlantic Ocean. This is essentially an undisputed issue as the J-Lot owners' own expert witness, Attorney Robert Danielson, conceded as much. The J-Lot owners' claim that the easterly boundary of Lot J-46 is the top of the bank is rejected.

11

At the outset, Woods and Muther had color of title[7] to the intertidal zone. This color of title was based on the 1972 Balfour to Cohen deed. However, Woods and Muther's color of title vanished through further chain of title research and expert testimony presented at trial. In Woods and Muther's chain of title, the deed to I. Alan Balfour from Raymond E. Jordan, dated December 12, 1967, and recorded in the Cumberland County Registry of Deeds in Book 3023, Page 188, contains the phrases, "to the Atlantic Ocean," and "by the shore."

> As a matter of law, a deed reference 'by the shore' calls for a measurement along the contour of the high-water mark . . . The 'shore' is the ground between the ordinary high and low water mark -- the flats -- and is a well defined monument. As a monument, the shore limits the grant to the high-water mark. Monuments control inconsistent courses, distances and quantity.

*Hodgdon v. Campbell*, 411 A.2d 667, 672 (Me. 1980) (internal citations and quotations omitted). Thus, Mr. Balfour did not have fee title to the intertidal zone, and he was unable to convey it to the initial owners of Lot J-46, even if he had intended to do so. "[A] person can convey only what is conveyed into them." *Eaton*, 2000 ME 176, ¶ 19, 760 A.2d at 240.

Therefore, as a matter of law, the eastern boundary of Lot J-46 is the approximate mean high water mark. Woods and Muther have not provided credible evidence that they have title to any land below the approximate mean high water mark, which includes the intertidal zone.

For these reasons, Woods and Muther do not hold "title in fee" to the intertidal zone below the mean high water mark. Accordingly, their rights in the intertidal zone are different from the property owners who were plaintiffs in *Bell v. Town of Wells* ("*Bell II*") 557 A.2d 168, 170 (Me. 1989) (stipulation that property owners owned the intertidal

---

[7] Color of title is defined as: "A written instrument or other evidence that appears to establish title but does not in fact do so." Black's Law Dictionary 283 (8th ed. 2004).

12

zone), and from those in *Eaton*, 2000 ME 176, ¶ 6, 760 A.2d at 236 (plaintiffs proved their title). However, as discussed below, Woods and Muther have standing to object to activities that occur in the intertidal zone insofar as those persons use the drainage and walkway easement to access that area and that usage results in an overburdenment of the easement. *See infra* section IX.

## VII. Declaratory Judgments

As the day is long, so is the list of questions regarding the scope of the drainage and walkway easement over Lot J-46. The findings and conclusions within this declaratory judgment regarding the scope of the easement provide guidance to the parties, but do not attempt to resolve every imaginable scenario that may arise on the easement or at Secret Beach. Going forward, all parties as neighbors whose lives are quite literally connected, if only through the right of way in dispute in this case, should act with mutual respect and tolerance for each other in implementing this Order.

Woods and Muther's complaint for a declaratory judgment and the J-Lot owners' complaint for a declaratory judgment ask the Court to decide the rights of the J-Lot owners to use the drainage and walkway easement which burdens Woods and Muther's property. The 1970 Plan indicates that the easement is a "20' Drainage and Walkway" easement. "A court construing the language of a deed . . . must first attempt to construe the language . . . by looking only within the 'four corners' of the instrument." *Pette v. Young*, 2001 ME 156, ¶ 8, 783 A.2d 637, 640. "If the deed is unambiguous, the court must construe the deed without considering extrinsic evidence; if the deed is ambiguous, however, the court may admit extrinsic evidence of the parties' intent." *North Sebago Shores v. Mazzaglia*, 2007 ME 81, ¶13, 926 A.2d 728, 733. "To determine the objectively manifested intent of the parties, a court may consider the practical construction which the parties placed upon [the deed] by their conduct, by acts

13

done by one party and acquiesced in by the other, especially when such conduct is proven to have continued for a long time." *Guild v. Hinman*, 1997 ME 120, ¶ 9, 695 A.2d 1190, 1193. Although "[s]ubsequent use by the parties may also be relevant," *id.*, its probative value diminishes the farther away it is from the original conveyance. To hold otherwise, would allow subsequent parties to re-write history through their ongoing use. Rather, the focus is, and must be, on determining the original intent of the grantor *at the time of the conveyance.*

### A.    Intertidal Zone and Secret Beach

It is clear from the 1970 Plan that the drainage and walkway easement is for ingress and egress to Secret Beach. It is also clear that the drainage and walkway easement is twenty (20) feet wide. Beyond that, the 1970 Plan is silent. As the Court indicated during the trial, the Court finds that there is an ambiguity in the phrase "Walkway Easement." Therefore, the Court considers extrinsic evidence to determine the intent of the parties' to the original conveyance. *See Badger v. Hill*, 404 A.2d 222 (Me. 1979) (holding where a reference to "pedestrian right of way or foot path" in the easement was ambiguous, review of why it was necessary to reach the water was required). "Generally access to a body of water is sought for particular purposes beyond merely reaching the water, and where such purposes are not plainly indicated, a court may resort to extrinsic evidence to assist the court in ascertaining what they may have been." *Id.* at 226. When the purpose of an easement is not provided, the purpose is determined by reference to the actual or presumed intent of the parties at the time the grant was made. *Chase v. Eastman*, 563 A.2d 1099, 1102 n. 3 (Me. 1989).

The circumstances surrounding Mr. Balfour's creation of the easement demonstrate his intention to create a passageway to the intertidal zone for general recreational purposes. First, the delineation on the 1970 Plan of the drainage and

14

walkway easement ending at the intertidal zone shows that access to the intertidal zone was intended. Second, and more importantly, the use of the intertidal zone prior to, during, and immediately after the conveyance demonstrates at least the original grantor's acquiescence to this type of activity and at most his actual or presumed intent in creating the easement to give easement holders access to Secret Beach for recreational purposes. For example, evidence from Robert Flaherty, Bruce Balfour, Nancy Wulf, Norman Wulf, and Mary Arnold shows a consistent pattern, since 1969, of usage of the intertidal zone of Secret Beach in front of Lot J-46 for recreational uses such as walking, swimming, reading, sitting, and similar activities. Before Woods and Muther purchased Lot J-46 in 2004, no one objected to this use.

In sum, around the time of the original conveyance most of the activity occurring in the intertidal area was not simply fishing, fowling, and navigation but were rather the recreational activities generally associated with the beach. These activities reflect the general perception of permissible activities on the beach. For these reasons, the Court concludes that it was the intent of I. Alan Balfour, in creating the drainage and walkway easement on the 1970 Plan, to provide access to Secret Beach to J-Lot owners for general recreational purposes.

**B.      Use of the Easement**

There are several remaining issues with respect to scope that must be addressed. The first issue is what types of use can be made of the drainage and walkway easement. Woods and Muther, not surprisingly, take a strict view of the term "walkway" and argue that only pedestrian foot traffic is permitted. Certainly, foot traffic is permissible on the "walkway easement," whereas motorized vehicles are certainly prohibited. However, Woods and Muther's interpretation of "walkway" is too narrow considering Balfour's intent to provide access to Secret Beach for recreational purposes for the J-Lot

15

owners in Broad Cove. Thus, wheeled apparatuses incidental to foot traffic, such as baby strollers, wagons and wheelchairs fall within the scope of the easement. Other modes of non-motorized travel, such as bicycles, are likewise within the scope of the easement. Wheeled apparatuses incidental to J-Lot owners exercising their public trust rights to fish, fowl, and navigate in the interitdal zone, such as bringing kayaks on wheels, are also within the scope of the easement.

The second issue is when the J-Lot owners can use the easement. Woods and Muther propose a 9 a.m. to sunset time restriction on the use of the easement as reasonable. There are no restrictions on the 1970 Plan regarding use of the intertidal zone at any time of day or night. The Court rejects Woods and Muther's proposal as an unreasonable burden on the J-Lot owners as owners of the dominant estate in this easement relationship. It stands then, as it has for decades, that J-Lot owners may use the easement, without time restrictions. Any use of the easement must be reasonable and not interfere with Woods and Muther's quiet enjoyment of their property.

The third and final issue is who may use the easement. The description of the easement as a "20' Drainage and Walkway" easement provides no detail concerning *who* may use the easement. As such, in determining the scope of the easement as it relates to who is entitled to use the easement this Court must again determine what the parties intended when the property was originally conveyed to determine what the appropriate scope of the easement is. Certainly, J-lot owners, occupants, and guests are permitted to use the easement. The Court finds it absurd to suggest that the record owner of the J-Lot accompany the other occupants or guests to use the easement, as suggested by Woods and Muther. Such a holding would require a husband and wife (such as Joseph Cotter-non-owner and Barbara Cotter-owner) to always make use of the easement together. This certainly was not the intent of the grantor. Rather, the Court

16

finds that it was the intent of the grantor to allow the holders of the easement, and a reasonable number of guests (acting with the owners' permission), to use the easement to access Secret Beach. It is conceivable that at some point a J-Lot owner could abuse such access by, for example, inviting large groups of individuals to use the easement over a period of time. This type of use, would be inconsistent with the historic pattern and use of the beach, and would in all likelihood be deemed an overburdenment of the easement. This is true not because the J-Lot owner allowed guests to use the easement but because the J-Lot owner would have allowed a number of guests to use the easement that is inconsistent with the scope of the easement as it was defined at the time of the conveyance. *See* Paul G. Creteau, *Maine Real Estate Law* 116 (1969) (stating that a "use in excess of the 'normal development' of the dominant estate results in a *surcharge* of the easement.") (emphasis in original)[8]; *But see Gutcheon v. Becton*, 585 A.2d 818, 822 (Me. 1991) (holding that "[i]t is well settled that a mere increase in the volume of traffic across the access road will not constitute a *per se* overburdening").

As stated above, it is impractical and impossible for this Court to outline every permitted and prohibited activity on the drainage and walkway easement. This Order provides guidelines to the parties, which will allow everyone involved to act reasonably and avoid any further judicial involvement, if they so choose.

## VIII. Injunctive Relief

The next issue is whether the presence of a gate with an electronic access system is reasonable for access to the drainage and walkway easement, if Woods and Muther provide key cards (and replacement cards) to all J-Lot owners at no cost. Other courts

---

[8] The accompanying example to this text is illustrative: "A and B are adjacent landowners. A conveys to B an easement to take water from a well located on A's land. At the time of the conveyance B is using his land as a private residence. B changes the residence into a hotel and continues to use the well to supply water to the hotel, thus leaving an inadequate supply for A. This constitutes a surcharge of the easement." Paul G. Creteau, *Maine Real Estate Law* 116 (1969).

17

have addressed this specific issue with varying outcomes. *See Annotation*, Daniel E. Feld, *Right to Maintain Gate or Fence Across Right of Way*, 52 A.L.R. 3d 9, § 23. Some factors to consider include: the presence of the gate across the easement at the time of the grant; the agricultural use of the servient estate; and evidence that the purpose or effect of the gate was not to obstruct the use of the way. *Id.* § 2[a]. In Maine, the dominant tenement "may properly be subjected to gates and bars not unreasonably established." *Ames v. Shaw*, 82 Me. 379, 382, 19 A. 856, 856 (1890). The *Ames* court held that the slight burden on the dominant estate in opening a gate was not unreasonable when the easement was for agricultural purposes. *Id.* In contrast, in *Goodale v. Goodale*, the court held that the specific language in the deed prohibited a gate. 107 Me. 301, 303, 78 A. 567, 568 (1910) (quoting the deed language stating that the lane should "be kept open in the same manner as the lane connecting therewith . . . ").

In this case, until May 2008, no gate encumbered the drainage and walkway easement. The gate was erected after Woods and Muther entered into a settlement agreement with the Association in the prior litigation and it is consistent with that agreement. Woods and Muther's purpose for erecting the gate was not to exclude J-Lot owners from accessing the drainage and walkway easement.

This access system, although widely used by businesses around the State, is not without functional flaws. However, the Court finds the potential for malfunctioning is negligible, but the potential for abuse or manipulation by Woods and Muther is substantial. Woods and Muther would be the sole persons responsible for activating and deactivating the electronic key cards. Woods and Muther's monitoring of the easement and Secret Beach, via the surveillance cameras or through personal observation has been constant and unrelenting. Confrontations with J-Lot owners and

18

others have been consistent since Woods and Muther purchased Lot J- 46 in 2004. Needless to say that there is tension between the J-Lot owners and Woods and Muther.

In sum, the J-Lot owners have shown that it is inconvenient and impractical to have a gate with electronic access controlled solely by Woods and Muther. Indeed, it requires J-Lot owners and their guests to be tethered to the electronic key card anytime they wish to use the drainage and walkway easement. Such a gate would be an unreasonable restriction to the access of J-Lot owners, despite the fact that Woods and Muther would provide electronic key cards at no charge. Therefore, the Court holds that Woods and Muther must remove the gate that is situated across the drainage and walkway easement.

Similarly, the presence of surveillance cameras at the gate area creates an impediment to access of the drainage and walkway easement, because it discourages J-Lot owners from exercising their right of passage that they have historically enjoyed. Therefore, the surveillance cameras are an unreasonable burden on the J-Lot owners, as holders of the dominant estate. The surveillance cameras must also be removed.

With respect to the floodlights, the Court holds that the lights, which are located off of the drainage and walkway easement but illuminate the walkway, are reasonable and may remain.

The drainage and walkway easement that burdens Lot J-46 is a private right of way for the benefit of the J-Lot owners. It is not a public easement. That said, Woods and Muther may post signage at the top of the easement depicting the lot numbers in Broad Cove that benefit from the easement in an effort to deter trespassing. Likewise, Woods and Muther have a right to request substantiation from easement users of their right to be there because Woods and Muther have a right to exclude individuals who do not have deeded or contractual rights to use the easement. This right to question

19

individuals using the easement is not unlimited; rather, the inquiry should be brief and civil. In this way, Woods and Muther can exercise their property right to exclude individuals while not unreasonably interfering with J-Lot owners' rights to use the easement to access Secret Beach.

## IX.    Overburdening

Having determined the scope of the easement, the court now addresses whether J-Lot owners have overburdened the easement. The Court must first address the threshold question of whether Woods and Muther have standing to object to the activities of the J-Lot owners in the intertidal zone in front of their property. As stated above, any claim of standing based on color of title is without merit given the evidence and this Court's decision that Woods and Muther own to the high-water mark, and do not own the intertidal zone. This conclusion, however, does not speak to the issue of whether the J-Lot owners' use of the drainage and walkway easement to access the intertidal zone for anything other than fishing, fowling, or navigation, or to access the upland properties of Woods and Muther or adjacent owners, is an overburdenment of the easement.

### A.    In General

In general, Woods and Muther have standing to restrict behavior in the intertidal zone only insofar as it affects, and ultimately changes the scope of the easement beyond the intent of the grantor.[9] For example, if there was evidence to suggest that historically J-Lot owners only used the drainage and walkway easement to access the intertidal zone for fishing, fowling, or navigation and then over time the use expanded to include

_____

[9] Counsel for Woods and Muther conceded that if the J-Lot owners got to Secret Beach from any of its other access points (e.g., by sea, Holt's property, or Raubeson's property) then Woods and Muther would not have standing to object to any activities occurring in the intertidal zone.

20

recreational activities the Court would look to see whether this change in use had an effect on the easement. *See discussion supra* section VIIB at 17.

**B.  Overburdening Analysis**

There are two different analyses for an overburdening claim. The test employed depends on the relationship of the parties involved in the dispute. *Poire v. Manchester,* 506 A.2d 1160, 1162-63 (Me. 1986). The touchstone of both tests is reasonableness of the use. *Id.; see also* Hermansen & Richards, *MSBA Practice Series, Maine Roads and Easements* § 3.5.2.4. The first test, the so-called "Overburdening Analysis" is used where the dispute arises between a dominant and servient tenement, as is the case here.[10] The overburdening analysis evaluates "whether it is reasonable to conclude that a particular use was within the contemplation of the parties to the conveyance and, in that context, whether the contested use made of the servient estate by the dominant estate exceeds the rights granted to the user." *Poire,* 506 A.2d at 1163.

Most of the activities at Secret Beach, historically and presently, are recreational. The activities were not limited to fishing, fowling, or navigation. Overall, the use of Secret Beach by J-Lot owners and others can be characterized as intermittent and decentralized, with more regular usage during the summer months. This type of use has been consistent since the creation of the easement. Therefore, the Court concludes that J-Lots owners' recreational use of Secret Beach was within the contemplation of the parties to the original conveyance.

With respect to the rights of the grantor at the time of the conveyance, it is clear that Balfour did not have rights in the intertidal zone at the time of the creation of the easement. However, at that time the public trust rights in the intertidal zone were

---

[10] In instances where the dispute is between holders of identical easements the test is the so-called "Reasonable in Comparison" test, which evaluates "whether the actual use made by one is reasonable in comparison with the actual use made by the others." *Poire,* 506 A.2d at 1163.

21

unsettled. In fact, even after the 1989 decision in *Bell II* there are still significant questions looming with respect to public trust rights.[11]

Therefore, under the Overburdening Analysis, the J-Lot owners have not overburdened the easement by using the easement to access the intertidal zone on Secret Beach for recreational purposes. However, the use of the drainage and walkway easement to access neighboring lands and Woods and Muther's upland are different matters entirely.

The J-lot owners' use of the drainage and walkway easement to access the upland of either Woods and Muther (outside the 20' drainage and walkway easement) or neighboring landowners, specifically that of Dr. Holt is not permitted. An easement that allows an easement holder to travel to one property is not allowed to use that same easement to travel to a separate property. *Farley v. Bryant*, 32 Me. 474 (1851); *see also Lakeside at Pleasant Mountain Condo. Ass'n v. Town of Bridgton*, 2009 ME 64, ¶ 18, __ A.2d__, __. Dr. Holt's property was not created as part of either plan that grants the J-Lot owners use of the drainage and walkway easement over Woods and Muther's property. Accordingly, this Court determines that a J-Lot owner's use of the easement to cross over to Holt's property would be an impermissible overburdening of the easement. Woods and Muther may restrict the use of the easement to prevent persons from using the easement to access Holt's upland property.[12]

---

[11] From 1641 until 1989 the rights of the public in the intertidal zone along Maine's coast was still an open question. In *Bell II*, the Law Court addressed this issue and held that the public trust rights are limited to fishing, fowling and navigation. 557 A.2d at 178. Woods and Muther's anachronistic attempt to overlay the holding in *Bell II* with Balfour's intent is not supported in this case given the testimony of individuals using the beach for recreational purposes around the 1970s, and more generally, given the practices and varying beliefs of the public from the 1600s until 1989.

[12] The J-Lot owners complain that the rocks at the end of the drainage and walkway easement impede their access to the intertidal zone. However, the Court finds that the Town of Cape Elizabeth, not Woods and Muther, placed the rocks at the end of the easement. If the J-Lot owners have a complaint regarding the rocks, or a request for stairs or some other graduated descent that would make the area more passable then that complaint must be brought to the Town of Cape Elizabeth. The Town is not a party in this matter.

## X. Prescription

Some of the J-Lot owners (Moody, Perkins, Stewart, Campbell, Hess, McGrath, Wulf) seek prescriptive rights to both the intertidal zone in front of Woods and Muther's property as well as Woods and Muther's upland. The remaining J-Lot owners assert prescriptive rights only to the intertidal zone.[13] In order to establish a claim for an easement by prescription a party "must prove (1) continuous use (2) for at least 20 years (3) under a claim of right adverse to the owner (4) with his knowledge and acquiescence, or (5) a use so open, notorious, visible and uninterrupted that knowledge and acquiescence will be presumed." *Eaton*, 2000 ME 176, ¶ 32, 760 A.2d at 244. The Court treats the J-Lot owners as a "class of persons" with regard to their prescriptive claims. *See* 14 M.R.S. § 812 (2008) (allowing a "class of persons" to acquire easement rights by adverse possession). Given this characterization, each J-Lot owner need not individually meet all of the elements for a prescriptive claim, but rather their prescription claims succeed or fail based on their use as J-Lot owners, a subset of the public at large.[14]

Nevertheless, the Court does not reach the substantive elements of the J-Lot owners' prescriptive claims for use of the intertidal zone in front of Woods and Muther's property because the true owner of the property is not a party to this case. *Lamson v. Cote*, 2001 ME 109, ¶ 20, 775 A.2d 1134, 1139 (holding that a prescriptive claim was "not ripe for adjudication until an owner of the land in dispute [was] declared."). As stated above, the Court has concluded that Woods and Muther are not the owners of the intertidal zone in front of Lot J-46. That does not, however, answer the question of

---

[13] The State withdrew its claim for a *public* prescriptive easement during a trial management conference held on July 2, 2009. The State confirmed this withdrawal in a letter dated July 29, 2009.

[14] The treatment of J-Lot owners as a class of persons with regard to their prescriptive claims is consistent with the position taken by this Court throughout this litigation. *See e.g.*, Summary Judgment Order dated July 8, 2009.

23

who *is* the true owner. Having failed to name the true owner of the intertidal zone, whatever prescriptive claim the J-Lot owners have to the intertidal zone in front of Lot J-46 is not ripe for adjudication.

As to the merits of the J-Lot owners' prescriptive claim to the upland of Lot J-46, the J-Lot owners failed to meet their burden of demonstrating continuous use for a period of 20 years, even under the more expansive characterization of J-Lot owners as a "class of persons." The only testimony relevant to these elements is testimony of individuals who were J-lot owners or acting in privity with J-Lot owners *at the time of their use*.

From this Court's review of the evidence, use of the upland area in front of Lot J-46 was limited prior to 1999. No evidence was presented that any J-Lot owner used the area prior to 1985. Mary Arnold testified that she used the upland between 1985 and 1995. Other J-Lot owners who testified to prior use – Norman and Nancy Wulf and Robert Flaherty – were not J-Lot owners until 1995 and 2005, respectively.[15] Additionally, the Secret Beach users did not differentiate between the upland and the intertidal zone.[16] In short, J-Lot owners failed to demonstrate continuous use for at least 20 years.[17] For these reasons, the Court holds that the J-Lot owners have failed to meet their burden to establish a prescriptive easement over Woods and Muther's upland.

Finally, Dr. Holt is not a party to these proceedings and there can be no ruling of this Court affecting his property; thus, any claim of prescriptive rights over the lands of Holt is rejected.

---

[15] Additionally, Nancy Wulf testified that she thought she had a right to be on the upland.

[16] Woods and Muther argue that the intertidal zone in front of Lot J-46 is analogous to wild uncultivated lands, and that any use is presumed permissive. *See Town of Manchester v. Augusta Country Club*, 477 A.2d 1124 (Me. 1984). The Court, however, is satisfied that the *Bell I, Bell II, and Eaton* decisions displace any general rule regarding beaches as wild uncultivated lands and presumptions therein.

[17] To claim a prescriptive easement as a "class of persons" requires more than simply one member of the class (i.e. Mary Arnold) engaging in the activity.

## XI.    Public Trust Rights

The only remaining claim for the Court in this non-jury phase of the litigation is the State's claim for expanded pubic trust rights in the intertidal zone. Having resolved all of the disputes among the private parties, the Court separately addresses the State's claim. The issue presented by the State is whether J-Lot owners have rights to recreate in the intertidal zone under Maine's Public Trust Doctrine.

As a threshold matter, Woods and Muther argue that the Court should not decide the State's public trust doctrine claim because the State failed to join the true owner of the intertidal zone. Having failed to do so, Woods and Muther argue, that the State failed to join an indispensable party and is therefore, not entitled to the relief it seeks. The Court disagrees.

The absence of the true owner of the intertidal zone is immaterial in this Court's decision regarding the public trust rights for several reasons. First, public trust rights impact all landowners along Maine's coast, yet it would be impossible to join them all in one lawsuit. Second, the public trust rights articulated in *Bell II* and requested by the State in this case have great import and wide-ranging impact beyond the individual parties to a case. Third, and finally, public trust rights present a question of law, which is not dependent on individual property rights. For these reasons, the Court reaches the merits of the State's public trust doctrine claim.

While this Court agrees with the discussions and reasoning set forth in then-Associate Justice Wathen's dissenting opinion in *Bell v. Town of Wells*, 557 A.2d 168, 187 (Me. 1989), and set forth in then-Associate Justice Saufley's concurring opinion in *Eaton v. Town of Wells*, 2000 ME 176, ¶ 50, 760 A.2d 232, 248, this Court must follow the majority opinions in these decisions. Only the Law Court can reconsider the decision in *Bell II*. In order to assist that Court, should it choose to do so, this Court makes the following

25

findings and conclusions, particularly in light of then-Associate Justice Saufley's concurring opinion in *Eaton*:

1. According to the Maine Department of Conservation's Maine Geological Survey, the coast of Maine has 5600 kilometers (3480 miles) of tidally-influenced shoreline and is the third longest in the United States. There are about 3500 islands included in the shoreline length. Mapping has estimated that about 2% of the coast (120 km or 75 miles) has beaches. About half of this distance is made up of sandy beaches and the other half is made up of coarser gravel and boulder beaches. The latter category is commonly called pocket barrier beaches, of which there are over 200 pocket barrier beaches that front coastal wetlands. Most large sandy beaches occur along the southern coast between Kittery and Cape Elizabeth, south of Portland. A few miles of sandy beaches also occur in midcoast Maine near the mouth of the Kennebec River. Maine Department of Conservation, Maine Geological Survey, at http://www.state.me.us/doc/nrimc/mgs/marine/marine.htm. *Eaton*, 2000 ME 176, ¶ 52 n.7, 760 A.2d at 249.

2. Maine has the longest coastline on the eastern seaboard of the United States. 1995 Almanac 495 (48ᵗʰ ed. 1995). *Eaton*, 2000 ME 176, ¶ 52 n.8, 760 A.2d at 249.

3. There is no dispute that the public may walk, sit, eat or stand in the intertidal zone for recreational or business purposes when the public fishes, fowls, navigates, picks up and lands passengers, travels over frozen waters, moors vessels and discharges and takes on cargo, and digs for worms, clams and shellfish.

4. It is no more burdensome on a private landowner's intertidal zone if the public's walking, standing, eating or sitting in the intertidal zone is unrelated to the activities described in the preceding Finding of Fact. There is no additional burden placed on the intertidal zone or the owner's use and enjoyment of the intertidal zone by a member of the public walking, sitting, eating or standing in the intertidal zone where such activity is not incidental or related to fishing fowling or navigation.

5. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is sitting in the intertidal zone simply to enjoy the view as compared to sitting in his beached recreational boat in the intertidal zone to enjoy the view. In fact, the burden is less.

6. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is sitting in the intertidal zone having a picnic as compared to sitting and having a picnic in his beached recreational boat in the intertidal zone. In fact, the burden is less.

7. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is sitting in the intertidal

zone reading a book as compared to sitting beside a boat beached in the intertidal zone to enjoy the view. In fact, the burden is less.

8. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is walking in the intertidal zone for exercise as compared to walking to or from a boat in the intertidal zone.

9. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is standing in the intertidal zone to enjoy the view as compared to standing in the intertidal zone while fishing with a net or pole.

10. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is sitting in the intertidal zone to enjoy the sun as compared to digging for worms in the intertidal zone. In fact, the burden is less.

11. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public floating above the intertidal zone at high tide rests upon the intertidal zone when the tide goes out, as compared to a boat floating above the intertidal zone at high tide coming to rest upon the intertidal zone when the tide goes out. In fact, the burden is less.

12. The burden on a private landowner's intertidal zone and the enjoyment of his or her property is no greater if a member of the public is simply eating or picnicking in the intertidal zone as compared to eating when fishing, fowling or navigating in the intertidal zone.

13. The types of uses described by the J-Lot owners and others are recreational activities such as sitting, standing, picnicking, and walking that are generally not incidental or related to fishing, fowling or navigation.

14. This litigation has been a significant financial, emotional and psychological burden on all of the parties, including notably Helen Muther, Nancy Wulf and Patricia Campbell. For Helen Muther, one of the owners of the lot fronting on Secret Beach, the financial and emotional burden was significant. For Nancy Wulf, one of the J-Lot owners, this litigation changed the life of her husband and her financially by requiring him to come out of retirement to take a short-term position to pay for the litigation. Ms. Campbell is a J-Lot owner who can no longer afford an attorney, and is representing herself in the litigation and in the trial, appearing in court every day instead of tending to her businesses. For Ms. Campbell the effect of the litigation on her has been a "huge burden."

15. Secret Beach, including the intertidal area in front of the lot owned by Woods and Muther, has been used since at least 1963 for recreational activities in the intertidal area such as walking, enjoying the water, sitting on chairs, reading, sitting on blankets, skipping stones, and other activities unrelated to fishing, fowling and navigation. In particular, the Court finds the testimony of Nancy Wulf that she extensively used Secret Beach since 1963 credible. Other witnesses

27

testified to such use since 1969 including Bruce Balfour, who is not a party and is the son of the developer of this area, as well as Robert Flaherty who is now a J-Lot owner. This testimony was uncontroverted and credible. No one objected to the recreational use of the beach until approximately 2004 when Mr. Woods and Ms. Muther purchased Lot J-46.

16. Activities related to fishing, fowling and navigation in the intertidal area at Secret Beach were not common, estimated by some as less than 1 percent.

17. Todd Colpitts – a J-Lot owner – did engage in recreational fishing in the intertidal area in front of the lot owned by Mr. Woods and Ms. Muther, including night fishing and also scouting without a fishing pole in order to determine if there might be good fishing. He testified that he also took his son with him fishing who did not have a fishing pole. Colpitts testified that fishing takes up more space than just sitting.

18. Mr. Woods testified that he is seeking to change the use of the intertidal area in front of his property from that which he had observed from 1999 to 2004.

19. Ms. Muther testified that the burden on the visual enjoyment of her property from someone sitting was no greater than someone fishing in the intertidal zone in front of her lot.

20. Ms. Muther testified that the burden on the physical enjoyment of her property from someone fishing was greater than someone just sitting in the intertidal area in front of her property in view of the safety considerations. In particular, she testified that she would allow her child to be closer to Mr. Colpitts – one of her neighbors – if he was playing with his son as compared to Mr. Colpitts casting his fishing pole in the intertidal zone in front of her property.

21. Ms. Muther testified that a member of the public, assuming he had legal access to the intertidal area in front of her property, can:

> fish for recreational purposes,
> fish at night,
> bring a flashlight when fishing at night,
> stand when fishing,
> sit when fishing,
> walk when fishing,
> walk to and from the spot from which he chooses to fish,
> enjoy the view while fishing,
> enjoy the view even if he knows he is not likely to catch any fish,
> eat while fishing,
> eat while sitting down while fishing, and
> fish with a child who does not have his own fishing pole.

22. Ms. Muther testified that a member of the public, assuming he had legal access to the intertidal area in front of her property, can in that intertidal area:

28

dig for worms, clams or shellfish for recreational purposes,
when digging for worms, clams or shellfish have a rake to conduct the digging,
when digging for worms, clams or shellfish have a bucket to store his worms, clams or shellfish,
sit when digging for worms, clams or shellfish,
stand when digging for worms, clams or shellfish,
walk around when digging for worms, clams or shellfish, and
eat when digging for worms, clams or shellfish.

23. Ms. Muther prefers not to go in the intertidal area if there is anyone else there.

24. Ms. Muther did not know 80 percent of the people she saw in the intertidal area in front of her property, since she first rented there in 1999. Essentially, they were members of the public to her.

25. Mr. Woods testified that people from all over the world come down to Secret Beach.

26. Dr. Holt did not object to quiet and peaceful uses of the portion of Secret Beach in front of his property, including such activities as walking without a fishing pole, sitting on a blanket or swimming.

27. Mr. Woods testified that a member of the public, assuming he had legal access to the intertidal area in front of his property, can in that intertidal area:

Fowl there for recreational purposes,
Sit while fowling,
Stand while fowling,
Eat while fowling,
Eat while sitting down while fowling,
Have a bird dog while fowling,
Beach a boat, without limitation on size,
Beach a boat for recreational purposes,
Stand in the beached boat,
Sit in the beached boat,
Sit beside the beached boat,
Stand beside the beached boat,
Walk to and from the beached boat,
Read a book in the beached boat,
Eat in or beside the beached boat,
Have a dog in the beached boat, and
Have a dog walk with him after getting off the beached boat.

28. The State has presented, through the testimony of Mr. Woods and Ms. Muther only, that Woods and Muther have a general view of what they consider to be "fishing, fowling and navigation" but their testimony does not rise to the level of a legal conclusion that this Court must accept. This Court declines to find that

29

Woods and Muther's opinions apply to any property other than the property in front of their home and to the extent that it applies to the property in front of Woods and Muther's home it has limited relevance as this Court is the arbiter of the correct interpretation of what constitutes activity directly related to "fishing, fowling and navigation."

29. Even though discrete recreational activities, when viewed in isolation, may be less burdensome to the property owner than similar discrete activities permitted under *Bell II*, expanding the public's use of the intertidal zone to include the broad range of recreational activities that the State suggests, would likely result in a substantial increase in the use of the intertidal zone by the public.

The State's request for expanding public trust rights in the intertidal zone does not fall on deaf ears; however, this Court is bound by precedent. Accordingly, the public trust rights in the intertidal zone are limited to fishing, fowling and navigation. *Bell II*, 557 A.2d at 178.

Therefore the entry is:

With respect to Plaintiffs' Count I (Declaratory Judgment), Woods and Muther's Counterclaim Count II (Declaratory Judgment) and Plaintiffs' Count II (Injunctive Relief):

The J-Lot owners have an "easement by implication based upon estoppel."

The eastern boundary of Lot J-46 is the approximate mean high water mark.

The intent of I. Alan Balfour, in creating the drainage and walkway easement on the 1970 Plan was to provide access to Secret Beach to J-Lot owners for general recreational purposes.

The following activities are permitted on the drainage and walkway easement: foot traffic; wheeled apparatuses incidental to foot traffic, such as baby strollers, wagons and wheelchairs; other modes of non-motorized travel, such as bicycles; and wheeled apparatuses incidental to the exercise of public trust rights to fish, fowl, and navigate in the intertidal zone, such as bringing kayaks on wheels.

Motorized vehicles are not permitted on the drainage and walkway easement.

The J-Lot owners may use the easement without time restrictions.

J-Lot owners, and a reasonable number of guests, may use the easement to access Secret Beach.

The electronic access system (i.e. the gate) is an unreasonable obstruction of the Plaintiffs/Third Party Defendants use and enjoyment of the easement.

The gate shall be removed. The surveillance cameras shall be removed. Woods and Muther may continue to have motion-detecting lights directed on the easement. Woods and Muther may post "No Trespassing" signage at the top of the easement. No other structures may be erected across or along the easement.

The Court granted a Temporary Restraining Order against Mr. Woods and the owners of Lot J-46, based on the inherent interference with the easement rights of J-Lot owners. The TRO included a prohibition against Defendants' interfering with J-Lot owners' access and use of the easement, and one against all parties from behavior, including speech, which unreasonably interferes with the parties' peaceful enjoyment of their property rights. These restrictions are now a Permanent Injunction. These restrictions do not prevent Woods and Muther from making reasonable inquiries of users of the drainage and walkway easement.

With respect to Woods and Muther's Counterclaim Count III (Overburdening of Easement) and Third Party Complaint Count VI (Overburdening of Easement):

The J-Lot owners have not overburdened the easement by using the easement to access the intertidal zone on Secret Beach for recreational purposes.

Use of the easement by J-Lot owners to cross over to Dr. William Holt's property is an impermissible overburdening of the easement and Woods and Muther may restrict the use of the easement to prevent persons from using the easement in this way.

With respect to Third Party Defendants' Counterclaim Count VI (Prescriptive Easement to the intertidal zone and above the high-water mark):

The J-Lot owners' prescriptive claim regarding the intertidal zone in front of Lot J-46 is not ripe for adjudication.

The J-Lot owners failed to establish a prescriptive easement over Woods and Muther's upland.

The J-Lot owners failed to establish a prescriptive easement over the lands of Holt.

With respect to the State of Maine's claim for public trust rights in the intertidal zone in front of the Woods and Muther property:

31

Members of the public do not have the public trust rights to engage in activities other than "fishing, fowling and navigation" in the intertidal zone.

The clerk shall incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated at Portland, Maine this 30th day of July, 2009.

Robert E. Crowley
Justice, Superior Court

32

## RE-08-98 FLAHERTY, ET ALS VS. MUTHER, ET ALS

## ATTYS OF RECORD:

Plaintiffs:
      Robert Flaherty                           **Thomas McNaboe, Esq.**
      Sheryl Flahert y
      Barbara Cotter
      Joseph Cotter
      Mary Arnold

Plaintiffs:
      Niamh Colpitts                           **Stephen Bither, Esq.**
      Todd Colpitts
      Russell Pierce
      Jacqueline Pierce
      Paulette York

VS.


Defendants:
      Helen Muther                            **Walter McKee, Esq.**
      Paul Woods                             **James Billings, Esq.**
      Buffett Coastal Trust

VS.

3rd Party Defs.
      1962 Broad Cove                       **Philip Mancini, Esq.**
      2005 Broad Cove                       **Alexander Saksen, Esq.**
      The New Broad Cove                 **Andrew Sparks, Esq.**
      The Merged Broad Cove
and


3rd Party Def.
      Beth Ellen Hess/Robert Hess      **Durward Parkinson, Esq.**
3rd Party Def.
      Peter Connolly                       **William Kany, Esq./**
                                        Jim Mason, Esq.
                                        Joshua Hadiaris, Esq.

3rd Party Defs.
      James Moody *                        **\*Andre Duchette, Esq./**
      Marjoriie Moody *                   **\*Gregg Frame, Esq.**
      Alison Perkins *
      Paul Stewart *
      Melanie Stewart *
      **Patricia Campbell (Pro Se)  PO Box 4727, Portland, ME 04112 799-9758\***
      Todd Colpitts

Niamh Colpitts
Paulette York
Russell Pierce
Jacqueline Pierce
David House       Stephen Bither, Esq.
Susan House        "  "
David Meagher      "  "
Ellen Meagher       "  "
Mary Arnold        "  "
Steve McGrath *
Elizabeth McGrath *
David Sawacki -  **defaulted**
Diane Beem - **defaulted**
Nancy Wulf *
Norman Wulf trustees *
Joseph Cotter
Barbara Cotter
Robert Flaherty
Sheryl Flaherty
Joseph Hettrick *
Eileen Hettrick *
Richard Raubeson      **Thomas McNaboe, Esq.**
Kathleen Raubeson     "   "

State of Maine – Intevenor     **Paul Stern**, AAG

STATE OF MAINE                                   SUPERIOR COURT
CUMBERLAND, ss                                CIVIL ACTION

DOCKET NO. RE-08-098

REC - C    -  12/

ROBERT FLAHERTY, et al.,
     Plaintiffs/Counterclaim Defendants

 

                                          ORDER ON THIRD
                                        PARTY DEFENDANTS'
v.                                          MOTION FOR
                                        SUMMARY JUDGMENT

HELEN MUTHER, et al.,
     Defendants/Third Party Plaintiffs

 

v.

 

THE 1962 BROAD COVE SHORE ASSOCIATION, et. al.,
     Third Party Defendants.

## BEFORE THE COURT

Third Party Defendants, the Broad Cove Shore Association[1] (collectively,

"Association"), filed this motion for summary judgment on Third Party Plaintiffs

Paul Woods' and Helen Muther's ("Woods and Muther") claims against the

Association for Breach of Indemnification, Fraud, and Breach of Implied

Warranty of Authority, pursuant to M.R. Civ. P. 56.

## BACKGROUND

These claims are the remaining claims arising out of an easement dispute

that dates back to November 2005. The history of this dispute can be traced

through the following decisions: *Muther v. Broad Cove Shore Ass'n*, 2007 Me.

---

[1] Third Party Defendants include the New Broad Cove Shore Association, the 1962
Broad Cove Shore Association, the 2005 Broad Cove Shore Association, the Merged
Broad Cove Shore Association, Beth Ellen Hess and Peter Connolly.

1

Super. LEXIS 185 (Me. Super. Ct., Sept 14, 2007); *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, 968 A.2d 539; *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100 (July 8, 2009), and *Flaherty v. Muther*, RE-08-098 (Me. Super. Ct., Cum. Cty., July 30, 2009) (Crowley, J.). The claims raised in this suit were bifurcated. The non-jury claims were decided in the Superior Court's July 30, 2009 decision.

The Broad Cove Shore Association is a non-profit homeowners association comprising approximately 243 households in and around the Broad Cove portion of Cape Elizabeth. Beth Ellen Hess and Peter Connolly are directors of the Broad Cove Shore Association. In 2005, Woods and Muther filed suit against the Association in an attempt to determine the existence of and to define the scope of a drainage and walkway easement over their property in Cape Elizabeth. The Association claimed its members have prescriptive rights to the easement. On November 29, 2006, with the assistance of Superior Court Justice Carl O. Bradford, Woods and Muther entered into a settlement agreement with the Association, which granted the Association members rights to use the drainage and walkway easement subject to certain conditions, including the erection of an electronic gate system. On the record, parties on both sides confirmed that they had authority to agree to the terms of the settlement agreement, including Hess and Connolly, who represented that as directors of the Association, they had authority to act on its behalf.

Woods and Muther drafted a memorialization of the settlement agreement, but the Association refused to sign it claiming the drafted agreement terms did not accurately reflect the agreement reached at the settlement conference. Woods and Muther sought to enforce the settlement agreement and filed suit in November 2005. The Superior Court determined that the twenty-

2

nine page transcript of the settlement agreement as read into the record at the settlement conference reflected an enforceable agreement between the parties. *Muther v. Broad Cove Shore Ass'n*, 2007 Me. Super. LEXIS 185, *8. The Law Court affirmed that decision in *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 1, 968 A.2d 539, 540 (hereinafter *"Muther I"*).

The Association agreed in the settlement agreement "to indemnify [Woods and Muther] if they are sued for an act or omission arising out of the conduct of the [Broad Cove Shore Association]." Settlement Agreement Transcript, Nov. 29, 2006, pages 7–8 (hereinafter "Settlement Tr."). Among the issues the Association raised on appeal in challenging the settlement agreement was whether the residents of Broad Cove who claimed individually-deeded[2] rights to the easement – the "J-Lot owners" – needed to be joined to the agreement. These residents are designated J-Lot owners because they each have an ownership interest in property labeled on the recorded development plan with a "J." Some, but not all, of the J-Lot owners are also members of the Broad Cove Shore Association. Hess, one of the Association's representatives, is a J-Lot owner. *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100, *5 n.4 (July 8, 2009). In affirming that the settlement agreement was an enforceable agreement, the Law Court stated: "Here, the settlement agreement, by its terms, is binding only upon the individual named parties and Association members . . . . [A]nd the resulting judgment does not impair the ability of unnamed individuals to enforce rights

---

[2] The J-Lot owners referred to their easement rights as "deeded easement rights" throughout their pleadings. However, as the court found in its July 30, 2009 decision, the J-Lot owners more accurately have an "easement by implication based upon estoppel" because their rights to the easement do not originate through their individual deeds, but through implication based on the fact that the plans creating their lots also included a depiction of the walkway easement to the beach.

that are not derived from Association membership." *Muther I*, at ¶ 9, 968 A.2d 542.

Subsequently, the J-Lot owners filed this present suit. The J-Lot owners sought declaratory judgment against Woods and Muther with respect to ownership of property in and around the easement, and with respect to the rights and responsibilities of both the dominant and servient estate holders. Woods and Muther asserted counterclaims against the J-Lot owners and a third party complaint against the Association. Among the claims in Woods' and Muther's third party complaint are the three remaining claims in this suit – Breach of Indemnification, Fraud, and Breach of Implied Warranty of Authority.

On July 8, 2009, the Superior Court concluded that the J-Lot owners were not parties to and were not bound by the settlement agreement because their rights to the easement are derived from references in the subdivision plans.[3] *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100, *19–21. As the court discussed:

> [T]he Court considers the interests of the Association versus the J-Lot owners. The two interests are different and, in fact, divergent. At stake in the prior litigation for the Association and its members was the right to access Secret Beach from Muther and Woods' property. For example, if the prior litigation proceeded to trial the fact-finder could have found that the Association failed to meet one of any number of the elements necessary for a prescriptive easement claim. However, the same was not true for J-Lot owners. Their right to access Secret Beach was not, and is not, dependent on a purported prescriptive use. Rather, the J-Lot owners' easement rights are derived from their deeds and the plan references. Thus, the J-Lot owners' ability to access the waterfront was never at issue or in jeopardy in the prior litigation.

---

[3] "When a conveyance expressly refers to a plan, that plan becomes part of the deed, with the same force and effect as if copied into the deed, and is subject to no other explanation by extraneous evidence than if all the particulars of the description had been actually inserted into the body of the deed." *Flaherty v. Muther*, RE-08-098 (Me. Super. Ct., Cum. Cty., July 30, 2009) (Crowley, J.) citing *Bradstreet v. Bradstreet*, 158 Me. 140, 146 (1962).

*Id* at *18-19. On July 30, 2009, following evidentiary hearings, the Superior Court made findings of fact and concluded, among other things, that the J-Lot owners have an "easement by implication based upon estoppel." *Flaherty v. Muther*, RE-08-098 (Me. Super. Ct., Cum. Cty., July 30, 2009) (Crowley, J.). Following the July 30, 2009 decision, the parties stipulated to the dismissal of the remaining claims involving the J-Lot owners.

The remaining claims in this suit are Woods' and Muther's claims against the Association for Breach of Indemnification, Fraud, and Breach of Implied Warranty of Authority. Woods and Muther claim (1) that the Association is required to indemnify them for costs of defending the instant litigation and the efforts of the J-Lot Owners to join the prior litigation; (2) that Beth Ellen Hess and Peter Connolly made false and misleading statements about their ability to bind all members of the Association, and (3) that Hess and Connolly gave an implied warranty of authority that they were acting on behalf of the J-Lot owners during the settlement agreement, which they breached.

These remaining claims relate to Woods' and Muther's perception of the Association's ability to represent and bind the J-Lot owners to the settlement agreement. According to Woods and Muther, the J-Lot owners were encompassed within the terms of the settlement agreement. Woods and Muther base their claims on the following facts. Prior to the settlement conference, the Association was communicating with its entire membership, including the J-Lot owners, and some J-Lot owners were contributing to the Association's attorneys fees. During the settlement conference, the settlement agreement referenced the 243 lots and all the plans of the Broad Cove Shore neighborhood, including the

5

1969 and 1970 plans, which conveyed the J-Lots. The agreement provided that the J-Lot owners would have to pay a lower annual fee for construction and maintenance of the gate than non-J-Lot owners. At the conclusion of the settlement conference, the Association's representatives Hess, Connolly, and the Association's attorney Andrew Sparks stated that they had the authority to represent and bind the Association. After the settlement conference, Woods and Muther claim that during discovery they were denied emails sent to the J-Lot owners on grounds of privilege, and this caused them to believe that the J-Lot owners were encompassed in the settlement agreement.

Woods and Muther claim these representations were false because after the settlement agreement several J-Lot owners claimed they were not represented by the Association at the settlement conference, and filed suit to assert their rights. Woods and Muther claim they relied on the Association's representations throughout the settlement agreement and have incurred losses as a result of the J-Lot owners' claims in this suit. The court addresses the three remaining claims below.

## DISCUSSION

### I. Standard of Review

In a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party to decide whether the parties' statements of material facts and the referenced record material reveal a genuine issue of material fact. *Rogers v. Jackson*, 2002 ME 140, ¶ 5, 804 A.2d 379, 380 (citations omitted). The Court gives the party opposing summary judgment the benefit of any inferences that might reasonably be drawn from the facts presented. *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18, 22. If the record

6

reveals no genuine issue of material fact then summary judgment is proper. *Id.* at ¶ 6, 784 A.2d at 21.

A contested fact is "material" if it could potentially affect the outcome of the suit under the governing law. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747. A fact is "genuine" if there is sufficient evidence supporting the claimed fact to require a fact-finder to choose between competing versions of facts at trial. *Id.* For the purposes of summary judgment, factual disputes and ambiguities must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926. A defendant moving for summary judgment has the burden to assert those elements of the cause of action for which the defendant contends there is no genuine issue to be tried. *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 9, 742 A.2d 933, 938. "A party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion." *Id.* *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

## II.  Law of the Case

Woods and Muther have indicated that they will likely appeal the Superior Court's July 8th and July 30th findings and conclusions of law. At this stage in the litigation, the parties are bound by the court's prior findings based on the law of the case doctrine. The law of the case doctrine has been developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18B Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4478, at 637–38 (2002). Under the

law of the case doctrine, a litigant may not, except for the most compelling reasons, reopen a question of law that has already been clearly decided in the same action. *Raymond v. Raymond*, 480 A.2d 718, 721 (Me. 1984). Neither party has offered any compelling reason for reopening questions of law this court has already decided. As a result, this court stands by its prior decisions.

## III.    The Indemnity Agreement

Woods and Muther claim that the Association is required to indemnify them for the expenses incurred in resisting the efforts of the J-Lot owners to join in the prior litigation, and for the costs of defending the present litigation, in which the J-Lot owners have sought declaratory relief. The basis of this claim stems from the November 2006 settlement agreement, in which the Association agreed to "indemnify [Woods and Muther] if they are sued for an act or omission arising out of the conduct of the [Association]." Settlement Tr., 7–8.

During the settlement conference, Hess, Connolly, and the Association's attorney Andrew Sparks represented that they had the authority to bind the Broad Cove Shore Association. Settlement Tr. at 28–29. However, as established during subsequent proceedings, their authority to bind the Association did not affect the rights of the J-Lot owners. The record clearly indicates that the J-Lot owners had rights to the easement that were independent from the rights held by members of the Broad Cove Shore Association. In the prior litigation, the Association argued that the "agreement was unworkable for want of necessary parties, namely [the J-Lot owners] who claim individually-deeded rights to the easement." *Muther I*, at ¶ 9, 968 A.2d at 542. In response to the J-Lot owners motions to join in the suit and for relief from judgment, the Superior Court held the following:

8

> The parties to this suit are the Association, Hess and Connolly.
> Hess and another director both confirmed to the court that they
> had the authority to bind the Association to the agreement reached
> at the settlement conference . . . .
>
> While the settlement agreement affects the rights of J-Lot
> owners, including the moving parties, derived from their
> membership in the Association, it does not affect any individually-
> deeded rights of any J-Lot owners not a party to this suit. The
> individual J-Lot owners, except for Hess, were not named as
> defendants to this suit and any rights they may have separate from
> those derived from the Association are not affected by this suit or
> the resulting settlement agreement.

*Muther v. Broad Cove Shore Ass'n*, RE-05-169 (Me. Super. Ct., Cum. Cty., Apr. 4, 2008) (Crowley, J.). The Law Court similarly held that the settlement agreement established a binding agreement and specifically stated that it did not bind residents of the Broad Cove neighborhood who claimed individual rights. The Law Court stated:

> [T]he settlement agreement, by its terms, is binding only upon the
> individually named parties and Association members. The
> agreement accepted by the court effectively and completely
> adjudicated the dispute before the court, and the resulting
> judgment does not impair the ability of unnamed individuals to
> enforce rights that are not derived from Association membership.

*Muther I*, at ¶ 9, 968 A.2d at 542 (citation omitted).

In the present litigation, on July 2, 2009, the parties stipulated that the J-Lot owners "have the right to use the access way to get to the inter tidal zone for uses to which Defendants Helen Muther, Paul Woods, and the Buffett Coastal Trust legally cannot object successfully." *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100, * 10 n. 7. Furthermore, this court recognized that the J-Lot owners' record easement rights are separate and independent of the Association's prescriptive easement rights, and held the J-Lot owners' efforts to join the prior litigation concern rights that were "never at issue or in jeopardy in the prior litigation." *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100, * 19. These holdings

9

indicate that the settlement agreement's indemnification clause did not include the J-Lot owners, except as to the rights derived from membership in the Association. The Association cannot be liable for breaching the indemnification clause of the settlement agreement based on the fact that the J-Lot owners subsequently sued Woods and Muther to assert their record easement rights.

Moreover, in order for the Association to breach the indemnification clause, a subsequent lawsuit must be attributed to "an act or omission arising out of the conduct" of the Association. As established in the court's July 30, 2009 findings, it was Woods' and Muther's conduct that prompted the J-Lot owners' lawsuit. The court made the following findings:

1. The J-Lot owners "have deeds that make a reference to the subdivision plans specifying the lot they own." *Flaherty v. Muther*, RE-08-098 (Me. Super. Ct., Cum. Cty., July 30, 2009), 6, Finding # 18.

2. The 1970 subdivision plan "designates an area across Lot J-46 (which currently belongs to Woods and Muther) as '20' Drainage and Walkway Easement.'" The deed to Woods and Muther is made subject to that easement. *Id.*, at 7, Finding # 21.

3. The 1970 subdivision plan "does not contain any restrictions on the uses of the drainage and walkway easement, such as numbers of persons or times of day for use. It does not provide for a gate or surveillance equipment. It does not contain any restrictions on the uses and activities in the inter tidal zone for people using the easement." *Id.*, at 7, Finding # 22.

4. Based on the references in the 1969 and 1970 subdivision plans, the court found that the J-Lot owners have deeded easement rights as a result of an "easement by implication based upon estoppel." *Id.* at 11.

5. The court found that J-Lot owners had an unrestricted record easement right to access the Secret Beach, so long as the uses were reasonable. *Id.*, at 16.

6. None of the J-Lot owners who used the easement "were challenged by any other person during their period of usage before 2004." *Id.*, at 8, finding # 33.

7. "From the time that he moved into the property in 1999, prior to owning it, Mr. Woods has taken photographs of individuals who were using the easement and beach area." *Id.*, at 8, Finding # 40.

8. "Mr. Woods intended to change the use of the easement and intertidal zone when he acquired ownership of Lot J-46 in 2004." *Id.*, at 8, Finding # 43.

9. "From 2005 to present, Mr. Woods has challenged on different occasions, individual J-Lot owners and their family members who were using their right of access through the drainage and walkway easement." *Id.*, at 8, Finding # 37.

10. "Mr. Woods and Ms. Muther have been hyper-vigilant about monitoring the use of the easement and of Secret Beach." *Id.*, at 8, Finding # 41.

11. "Some J-Lot owners are frightened by the behavior of Mr. Woods in his confrontation of individuals as the easement area." *Id.*, at 9, Finding # 44.

12. As part of the settlement agreement from the prior litigation, "[i]n May of 2008, Mr. Woods erected a gate near the top of the easement area; and he erected a fence across the entrance to the easement area." *Id.*, at 9, Findings # 45–46.

13. "Mr. Woods did not obtain the consent of the individual J-Lot owners prior to constructing the gate." *Id.*, at 9, Finding # 48.

14. "Mr. Woods installed an electronic surveillance camera system on the drainage and walkway easement, without the consent of the individual J-Lot owners. *Id.*, at 9, Finding # 53.

15. "Mr. Woods installed a system of motion detecting floodlights around the easement area, without the consent of the individual J-lot owners." *Id.*, at 9, Finding # 55.

It is clear from the findings in the court's July 30, 2009 judgment that it was the actions of Woods and Muther that prompted this current litigation. As a result, Woods' and Muther's claim that the Association is required to indemnify them for costs of defending the current litigation must fail.

## IV. The Fraud Claim

Woods and Muther claim that Hess and Connolly, as representatives of the Broad Cove Shore Association, committed fraud or intentional

misrepresentation by making false and misleading statements about their ability to bind all members of the Association, including the J-Lot owners. As an initial matter, the Association's claim that the settlement agreement transcript constituted an integrated contract is not supported by the facts. The Association's argument that the contract was integrated appears to be an attempt to prevent Woods and Muther from using parol evidence to prove their fraud claim.[4] The settlement agreement was not an integrated agreement. It is clear from the settlement conference transcript, Settlement Tr., at 8, and from Woods' and Muther's subsequent attempt to memorialize the settlement agreement that the settlement agreement was not an integrated agreement.

Additionally, the Association claims summary judgment should be granted because Woods and Muther failed to plead fraud with sufficient particularity in accordance with M.R. Civ. P. 9(b).[5] This claim lacks merit. Rule 9(b) relates to the sufficiency of the pleadings in the Complaint and is more appropriately raised as an argument in a Motion to Dismiss. The Third-Party Complaint was filed on June 12, 2008. Since that time there has been extensive discovery and a two-week evidentiary hearing before this court. The

---

[4] The parol evidence rule "operates to exclude from judicial consideration extrinsic evidence offered to vary, add to, or contradict the terms of an integrated written agreement." *Brown Dev. Corp. v. Hemond*, 2008 ME 146, ¶13, 956 A.2d 104, 108. "A contract may be completely or partially integrated, and the degree of integration will impact the scope of permissible extrinsic evidence." *Id.* Whether a contract is integrated is a question of law. *Id.* An integrated contract is a writing constituting a final expression of one or more terms of the contract. Restatement (Second) of Contracts § 209 (1981).

[5] M.R. Civ. P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

Association's Rule 9(b) argument is late and the court is satisfied that the pleadings in Woods' and Muther's Third Party Complaint are sufficient.

The Association claims that Woods and Muther have not produced facts that support liability for intentional misrepresentation. In order to make a claim for intentional misrepresentation:

> The plaintiff must prove by clear and convincing evidence: (1) that the defendant made a false representation, (2) of material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the plaintiff to act in reliance upon it, and, (5) the plaintiff justifiably relied upon the representation as true and acted upon it to the plaintiff's damage.

*Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9. A plaintiff alleging fraud has the considerable burden of proving each element of fraud by clear and convincing evidence. Simmons, Zillman, & Gregory, *Maine Tort Law* ¶ 11.03 (1999 ed.) "Evidence is clear and convincing if the factfinder could reasonably have been persuaded that the required findings were proved to be highly probable." *Maine Eye Care Assocs., P.A. v. Gorman*, 2006 ME 15, ¶ 18, 890 A.2d 707, 711 (citations omitted).

In order to establish a fraud claim, Woods and Muther must show by clear and convincing evidence that the Third Party Defendants made false representations of material fact. Woods and Muther claim the following facts support their contention that the Association represented that the J-Lot owners were bound by the settlement agreement:

1. Prior to the settlement conference:

   a. The Association was communicating with its entire membership. Some J-Lot owners were extensively involved with the Association

in the prior litigation and many J-Lot owners contributed to the Association's legal defense.[6]

2. During the settlement conference:

   a. Woods' and Muther's attorney Judy Metcalf specifically referenced the 243 lots in the Broad Cove Shore Association, and stated that the agreement would be binding on owners of lots in the 1969 and 1970 plans, the plans that conveyed the J-Lots.

   b. Metcalf indicated that the J-Lots would pay a lower annual fee than the non-J-Lot owners for the maintenance of the gate.

   c. At no point during the settlement conference did anyone say the settlement agreement would not be binding on the J-Lot owners.

   d. At the conclusion of the settlement conference, Hess, Connolly, and the Association's attorney, Andrew Sparks, stated they had authority to represent and bind the Association to the agreement.

3. After the settlement conference:[7]

   a. Woods and Muther claim that shortly after the settlement conference, several J-Lot owners attended a meeting at Hess' house and ratified the agreement by voicing their support.[8]

   b. Wood and Muther assert that the Association communicated and emailed with the J-Lot owners leading up to the settlement conference. Woods and Muther claim that when they requested those emails through discovery they were denied as privileged, further leading them to believe the J-Lot owners were represented by the Association.

In the court's view, based on these facts, it is not established that the Association made a misrepresentation of material fact. First, none of the facts Woods and Muther assert suggest the J-Lot owners were represented in any

---

[6] The court accepted these facts as true in its July 8, 2009 Order. *Flaherty*, 2009 Me. Super. LEXIS 100, * 20. However, there is no evidence that the contribution of J-Lot owners was disproportionate to non-J-Lot owners.

[7] It is questionable whether post-settlement events are relevant to claims of fraud and breach of warranty or implied warranty.

[8] "There is no evidence before the Court, beyond the J-Lot owners "applause", regarding the J-Lot owners' authorization to have their individual interests represented during the prior litigation." *Id.* at *21.

14

capacity other than as members of the Association. As indicated in the May 23, 2006, Answer and Counterclaim of all Defendants, the prior litigation (*Muther I*) primarily dealt with whether the Association and its members had prescriptive rights to the walkway to Secret Beach.[9] The fact that some J-Lot owners contributed to the attorneys fees and applauded the settlement agreement does not mean the J-Lot owners were abandoning their record easement rights. Second, all of the subdivision plans creating the Broad Cove neighborhood were referred to during the settlement agreement, which negates the significance Woods and Muther place on the reference to the 243 lots and to the 1969 and 1970 plans. Third, regarding the different annual fee for J-Lot owners, there was never any articulation on the record either during the settlement agreement or in the summary judgment record as to why there was a lower fee for the J-Lot owners. The J-Lot owners record easement rights may be one possible explanation, but it is also possible that the fee differential was because the J-Lot owners lived closer to the walkway, used the walkway and beach more, or had a better prescriptive rights claim. The reasoning for the lower annual fee for the J-Lot owners is left largely to conjecture. Fourth, while it is true that nobody said the J-Lot owners would not be bound at the settlement conference, the converse is also true in that it was never expressly stated that the J-Lot owners would be

---

[9] The May 23. 2006 Counterclaim sought declaratory judgment that the Association and its members have a legal easement, a private prescriptive easement, and a public prescriptive easement to access and use Secret Beach. The following excerpt from the First Amended Answer, Affirmative Defenses and Counterclaim of all Defendants further supports the fact that the Association was only concerned with assuring prescriptive easement rights:
"The Defendants restate their defenses and affirmative defenses as set forth in their original answer except to clarify Affirmative defense #5 to make it clear that it asserts both public and private prescriptive rights for each Defendant." Def.'s Countercl. at 1.

bound by the agreement. Lastly, during the settlement agreement there was never discussion about reforming the J-Lot owners' record easement rights. Nothing in the record shows that the Association was authorized to transact in the J-Lot owners' deeded rights.

As the party asserting fraud, Woods and Muther must provide clear and convincing evidence that a fraud occurred. Even when factual disputes are resolved against the Association, as the moving party, the facts offered by Woods and Muther in opposition to summary judgment on the fraud claim would not, if offered at trial, be sufficient to withstands a motion for judgment as a matter of law. Accordingly, summary judgment is granted to the Association on the fraud claim.

## V.     Breach of Implied Warranty of Authority

Woods and Muther assert that Hess and Connolly, as representatives of the Association, gave an implied warranty of authority that they were acting on behalf of the J-Lot owners when the Association entered into the settlement agreement.[10] Woods and Muther claim that Hess and Connolly lacked the power

---

[10] As provided in Woods' and Muther's Third Party Complaint:

4.  During the memorialization of the agreement before Justice Bradford, counsel for the Association, in conjunction with two of its Directors, Hess and Connolly who were also present, acknowledged that they had the authority to bind the Association. On countless occasions prior to the settlement Hess and Connolly also represented that it in fact represented approximately 240 households, including the so-called "J-Lot" households, and had the complete authority to act on all such owners' behalf. Third Party Countercl. ¶ 4. June 12, 2008.

15.  Third-Party Defendants Hess and Connolly are or have been Directors in the Association during the prior litigation with Third-Party Plaintiffs. As Directors, they are and were responsible for acting on behalf of their membership. In that capacity Third-Party Defendants Hess and Connolly gave to Third-Party Plaintiffs an implied warranty of authority that they were acting on behalf of the J-Lot owners when the Association entered into the settlement agreement with Third-Party Plaintiffs. *Id.* at ¶ 15.

16

to bind the whole Association, as evidenced by the J-Lot owners' suit. As a result, Woods and Muther claim Hess and Connolly breached their implied warranty of authority and are liable for the damages they incurred in the subsequent litigation.[16] The court disagrees.

The Restatement (Second) of Agency states that an agent is liable to a third party when he breaches an implied warranty of authority:

> A person who purports to make a contract, conveyance or representation on behalf of another who has full capacity but whom he has no power to bind, thereby becomes subject to liability to the other party thereto upon an implied warranty of authority, unless he has manifested that he does not make such warranty or the other party knows that the agent is not so authorized.

2 Restatement (Second) of Agency § 329 (1958). The central question in this claim is whether Hess, Connolly, or the Association purported to represent the J-Lot owners in a capacity other than as members of the Association. On this issue, Woods and Muther bear the burden of proof and must show by a preponderance

---

16. Plaintiffs in the above-captioned matter have stated that the Association did not have authority to act on their [the J-Lot owners] behalf. Third-Party Defendants Hess and Connolly lacked the power to bind their membership and, as a result, the implied warranty was breached. Third-Party Plaintiffs justifiably relied on the acts and representations of these Third-Party Defendants to their detriment and with loss of the benefit expected from the settlement agreement. *Id.* at ¶ 16.

[11] Woods and Muther do not assert that Hess, Connolly, or the Association had express actual authority, nor do they claim that Hess, Connolly, or the Association had apparent authority. "Actual authority consists of the powers which a principal directly confers upon an agent or causes or permits him to believe himself to possess." 2A C.J.S. *Agency* § 147 (1972). Apparent authority is authority "a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence." *Id.* at § 157(a). Moreover, the court has already ruled that the J-Low owners were not bound by the settlement agreement.

17

of the evidence that the Association purported to represent the J-Lot owners with respect to rights not derived from membership in the Association.[12]

The same facts upon which Woods and Muther rely in support of their fraud claim also fail to support their claim that the Association purported to represent the J-Lot owners in a capacity beyond their membership in the Association. A quick recount of the circumstantial facts Woods and Muther rely upon: (1) the fact that Hess was a J-Lot owner;[13] (2) the emails sent to Association members, including J-Lot owners; (3) the fact that some J-Lot owners contributed to the Association's legal fees; (4) the applause some J-Lot owners gave in support of the settlement agreement; (5) the settlement agreement's articulation that J-Lot owners would pay a different fee to maintain the gate than other members of the Association; (6) the reference to the 243 lots and the 1969 and 1970 plans during the settlement agreement; (7) and the fact that nobody stated the settlement agreement would not be binding on the J-Lot owners. As discussed above in the prior section, none of these facts suggest the J-Lot owners were represented in any capacity other than as members of the Association.

---

[12] "The degree or amount of proof required to establish the authority of an agent may vary according to the nature of the authority sought to be proved; but ordinarily a preponderance of the evidence is necessary and sufficient." 3 C.J.S. § 539 (1973). In some circumstances clear and convincing evidence is required to establish the authority of an agent. *Id.* For the purposes of this motion, the court applies the preponderance of the evidence standard. Arguably, clear and convincing evidence of Hess, Connolly, and the Association purporting to represent the J-Lot owners could be required because: (1) Woods and Muther assert the Association purported to deal the J-Lot owners' record easement interests – a transfer of an interest in land that must comply with the more exacting requirements of the Statute of Frauds, and (2) the elements of a claim for breach of implied warranty of authority are strikingly similar to the elements required for Woods' and Muther's claim of fraud, which requires clear and convincing evidence.

[13] The Court found that Hess was bound by the Settlement Agreement because she was an individually named defendant in *Muther I*. *Flaherty v. Muther*, 2009 Me. Super. LEXIS 100, *14–15. Beth Ellen Hess was named as an individual defendant in *Muther I*.

Additionally, it is important to remember that in the prior litigation the Association was asserting a prescriptive easement right and were seeking a declaration from the court that they had rights to the easement. The Association's assertion of prescriptive easement rights was negotiated during the settlement conference without consideration of the Statute of Frauds. However, as the court held on July 30, 2009, the J-Lot owners have a record easement right based on an "easement by implication based upon estoppel." *Flaherty v. Muther*, RE-08-098 (Me. Super. Ct., Cum. Cty., July 30, 2009) (Crowley, J.). The J-Lot owners had rights to the easement from the time the neighborhood plans were created. Accordingly, if Woods and Muther intended through the settlement agreement to acquire the J-Lot owners' record rights, then the agreement would have had to comply with the Statute of Frauds. The Statute of Frauds applies to the transfer of any interest in land. 33 M.R.S. § 51. According to the Statute of Frauds, no action shall be maintained on any contract or agreement transferring an interest in land unless the contract or agreement is in writing and signed by the parties authorized to enter the agreement. *Id.* Nothing in the settlement agreement calls for the execution of deeds by individual J-Lot owners or adding them as named parties to be bound by a stipulated judgment to be recorded in the registry of deeds.[14]

---

[14] Woods' and Muther's attorney Judy Metcalf stated during the settlement conference:
"That agreement will be in the form of a stipulated judgment recorded at the Registry of Deeds, and it's binding upon the individual pl - - defendants that you - - that you identified, but also on the 1962 Broad Cove Shore Association, the 2005 Broad Cove Shore Association, the reported merged Broad Cove Shore Association and any new Broad Cove Shore Association which may arise as a result of the settlement that we've crafted here today."

Based on the above analysis, the court finds that the Association did not impliedly warrant representation of the J-Lot owners in a capacity beyond their membership in the Association. Accordingly, the Association cannot be found liable for breaching an implied warranty authority as a result of the J-Lot owners' subsequent suit.

Therefore, the entry is:

The court GRANTS the Third Party Defendants' Motion for Summary Judgment on Woods' and Muther's claims for Breach of Indemnification, Fraud, and Breach of Implied Warranty of Authority.

Dated at Portland, Maine this ___1st___ day of ___December___, 2009.

Robert E. Crowley
Justice, Superior Court

---

Settlement Tr. at 3. The J-Lot owners were not named as a group or individually, and the settlement agreement is expressly not binding on the J-Lot owners in a capacity beyond their membership in the Association.

**STATE OF MAINE**
CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

PHILIP MANCINI ESQ - *Broad Cove*
DRUMMOND & DRUMMOND
ONE MONUMENT WAY          *dogs*
PORTLAND ME 04101



**STATE OF MAINE**
CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

WALTER MCKEE ESQ      - *Words &*
LIPMAN KATZ & MCKEE          *murder*
PO BOX 1051
AUGUSTA ME 04332-1051



STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-08-98
TDW - CUM - 5/8/2012

ROBERT FLAHERTY, et al,

    Plaintiffs

v.

ORDER

HELEN MUTHER, et al,

**STATE OF MAINE**
Cumberland, ss, Clerk's Office

MAY 08 2012

**RECEIVED**

    Defendants

On March 22, 2011 the Law Court issued a decision affirming in part and vacating in part a decision by the Superior Court (Crowley, J.) adjudicating the rights of certain landowners, known in this case as the J-Lot owners, with respect to a right-of-way that provides access to a small beach known as Secret Beach in Cape Elizabeth. See 2011 ME 32, 17 A.3d 640. In that decision the Law Court remanded one major issue for further determination by the trial court. That issue involves the reasonableness of certain video surveillance cameras that had been placed by defendants Helen Muther and Paul Woods on the right-of-way. See 2011 ME 32 ¶ 72.[1]

---

[1] In its decision the Law Court also vacated the trial court's award of costs to allow reconsideration of whether the J-Lot owners were still the prevailing parties in light of the disposition of the appeal and because the award of costs had been entered after Muther and Woods had filed a notice of appeal. 2011 ME 32 ¶¶ 89-90. On a separate appeal in this case, the Law Court also remanded the issue of whether certain J-Lot owners were entitled to attorney fees based on denials of certain requests for admission addressed to Muther and Woods. 2011 ME 34. This court has deferred the award of costs and Rule 37(c) attorney fees until the entry of a final judgment on the merits.

1. Background

In lieu of reciting the extensive procedural and factual background, the court will rely on the exposition contained in the Law Court's decision at 2011 ME 32 ¶¶ 4-27. In that decision the Law Court affirmed the trial court's ruling that the J-Lot owners were not bound by a prior settlement agreement with the Broad Cove Shore Association.[2] 2011 ME 32 ¶ 36. It affirmed the trial court's rejection of the third party indemnification claims brought by Muther and Woods against the Broad Cove Shore Association. 2011 ME 32 ¶¶ 43, 47, 52. In addition, it affirmed the trial court's determinations as to the scope of the easement possessed by the J-Lot owners over the right-of-way and the permitted uses of that easement. 2011 ME 32 ¶¶ 54-61.[3]

In the portion of its decision that is relevant here, the Law Court addressed the trial court's determinations that the placement of an access gate and video surveillance cameras on the easement placed an unreasonable burden on the j-Lot owners' use of the easement. With respect to the access gate, the Law Court reversed the trial court's decision and concluded that, as a matter of law, an access gate does not unreasonably interfere with the J-Lot owners' use of the easement. 2011 ME 32 ¶ 71. With respect to the surveillance cameras, the Law Court remanded that issue for reconsideration by the trial court with the direction to review that issue "in conjunction with Muther and Woods's obligations under the [Broad Cove Shore Association] settlement agreement." 2011 ME 32 ¶ 72.

---

[2] That settlement agreement had been the subject of a prior appeal in Muther v. Broad Cove Shore Association, 2009 ME 37, 968 A.2d 539.

[3] The Law Court also affirmed the trial court's determination that use of the easement by J-Lot owners to access upland property owned by a non-party (William Holt) would overburden the easement and its determination that J-Lot owners had not established prescriptive rights over the upland portion of the property owned by Muther and Woods. 2011 ME 32 ¶¶ 76, 85.

2

## 2. Proceedings Subsequent to Remand

On the surveillance camera issue, the Law Court specified that this court could decide the issue based on the existing record or receive additional evidence. 2011 ME 32 ¶ 72 n.13. The parties did not seek to offer additional evidence on this issue but instead chose to rest on the existing record and submitted memoranda setting forth their respective positions.

The proceedings on remand have been conducted simultaneously with further proceedings in the companion case of Muther v. Broad Cove Shore Association, RE-05-179. Although the resolution of both cases has been delayed by the recusal in late 2011 of the trial justice to whom the cases had originally been reassigned upon remand (Justice Crowley having retired in the meantime), the court has now reviewed the portions of the existing record and the trial exhibits relied upon by the parties in their submissions on the surveillance camera issue. It has also reviewed the trial court's prior findings, portions of the transcript from the eight-day bench trial upon which those findings were based, and the settlement conference transcript and portions of the record relating to the settlement agreement in RE-05-169. The latter evidence is pertinent because the Law Court ruled that Justice Crowley had erroneously excluded evidence relating to the settlement and the J-Lot owners' awareness of its terms, 2011 ME 32 ¶ 69, and the Law Court specifically directed that upon remand, the settlement agreement should be considered in connection with the surveillance camera issue. 2011 ME 32 ¶ 72.

## 3. Reasonableness of Surveillance Cameras

The trial court found that since 2005 Mr. Woods has challenged J-Lot owners using their right of access across the easement and has confronted J-Lot owners who

3

wished to use the easement. July 30, 2009 Judgment at 8, ¶¶ 37-38. It found that Mr. Woods had informed J-Lot owners that their right to use the easement was limited, and that Mr. Woods's testimony to the contrary was not credible. Id. ¶ 39. It further found that from the time he moved into the property, Mr. Woods has taken photographs of individuals who were using the easement and the beach area and that Mr. Woods and Ms. Muther have been "hyper-vigilant" about monitoring the use of the easement. Id. ¶¶ 40 – 41. These findings are supported by the evidence, and many were reiterated by the Law Court in its decision on the appeal from the trial court's decision. 2011 ME 32 ¶ 12.

The trial court further found that some J-Lot owners were frightened by their confrontations with Mr. Woods and have limited their use of the easement as a result. July 30, 2009 Judgment at 9, ¶ 44, a finding reiterated in the Law Court decision at 2011 ME 32 ¶ 12. Most of the J-Lot owners have expressed concern about the need for a video surveillance system, and the trial court found that the presence of surveillance cameras discourages J-Lot owners from exercising the right of passage they have historically enjoyed over the easement. July 30, 2009 Judgment at 9, ¶ 54, and p. 19. See Law Court decision, 2011 ME 32 at ¶ 64.

Significantly, no approval or agreement with respect to surveillance cameras was included as part of the November 29, 2006 settlement in RE-05-169. The only mention of photography of any kind in the recitations comprising the settlement agreement was a statement by counsel for defendants that, as part of a mutual "nondisturbance" clause, it was anticipated that "peaceful users of the access are not gonna be photographed, approached, or questioned while they're using the easement." November 29, 2006 settlement transcript in RE-05-169 at 26-27, quoted by the Law Court at 2011 ME 32 ¶ 16. Counsel for Muther and Woods did not express any reservations, qualifications or

4

disagreement with this statement when it was made at the settlement conference. Nor did Mr. Woods, who was present and who spoke up to express his concerns and some cases his disagreement with counsel's recitations on other issues.[4]

Based on the deterrent effect that surveillance cameras will have on some J-Lot owners' use of the easement and based on the statement at the November 2006 Broad Cove Association settlement that peaceful users of the easement "are not gonna be photographed," the court finds that – under the specific circumstances of this case – the presence of surveillance cameras will unreasonably interfere with the J-Lot owners' use of the easement.

Unlike the access gate, surveillance cameras are not a required element of the 2006 settlement between Muther and Woods and the Broad Cove Shore Association. The Law Court's conclusion that Muther and Woods were entitled to maintain an access gate in the J-Lot owners' case was motivated in part by its conclusion that, if ordered to remove the access gate, Muther and Woods would be "placed in a position where they will be unable to comply with both judgments governing the easement." 2011 ME 32 ¶ 67. In contrast, removing surveillance cameras from the easement does not place Muther and Woods under any conflicting obligations.

While the discussion at the November 2006 settlement conference addressed the subject of photographing users of the easement in general and did not specifically address the use of surveillance cameras as part of an access system, the clear implication of the general discussion strongly disfavors the use of surveillance cameras. To the extent that J-Lot owners were aware of the details of the settlement, they would have shared that understanding.

---

[4] See, e.g., November 29, 2006 settlement transcript in RE-05-169 at 12-14, 20.

5

The trial court found that unknown teenagers and other persons, not J-Lot owners or their families, were the source of most of the disturbances and all of the criminal activity that had occurred on the easement or on Secret Beach. July 30, 2009 Judgment at 8 ¶ 42. Those persons will be denied entry by the access gate, which will only allow entry to J-Lot owners, their families, and guests, and authorized members of the Broad Cove Shore Association. The court does not share the concern, expressed by Muther and Woods in their submittal on remand,[5] that J-Lot owners and authorized members of the Association will circulate their cards to unauthorized users. On this record, any such concern would be speculative.[6]

The Law Court noted that there is no evidence to justify apprehension on the part of J-Lot owners that images taken by the surveillance cameras would be misused. However, prior confrontational behavior by Mr. Woods, including the taking of photographs, has been found to have frightened some J-Lot owners and deterred them from exercising their rights to use the easement. July 30, 2009 Judgment at 8 ¶¶ 37-38, 41, 43, 44, 54. Under these circumstances, the presence of surveillance cameras will likely have a deterrent effect on some J-Lot owners and their families and has not been shown to be necessary to police the access card system.

Recognizing that not just J-Lot owners but also their families, occupants, and guests are entitled to use the easement,[7] it is the court's fervent hope that the access card system will not result in a series of challenges and inquests to determine the identity of each person who uses an access card to obtain entry. If there is future evidence of

---

[5] See Defendants/Third Party Plaintiffs' Reply Memorandum Regarding Security Cameras dated July 7, 2011 at 4-5.

[6] One disincentive to such behavior is that, if authorized users were to circulate their cards to unauthorized users, the authorized users would themselves lose access in the meantime and could not be sure when, or even if, the cards would be returned.

[7] See July 30, 2009 Judgment at 16.

significant misbehavior that could be prevented or deterred by the presence of surveillance cameras, Muther and Woods can seek appropriate relief. Similarly, if there is evidence of any significant and unwarranted interference with the rights of J-Lot owners resulting from Muther and Woods's control over the issuance, activation, and deactivation of access cards, the J-Lot owners can also seek appropriate relief. See 2011 ME 32 ¶ 70 n.12.[8]

The entry shall be:

On remand, the prior judgment having been vacated in two respects, final judgment is hereby entered (1) declaring, under the circumstances of this case, that the access gate is not an unreasonable interference with the use of the easement and (2) determining, under the circumstances of this case, that the surveillance cameras do constitute an unreasonable interference with the use of the easement and shall be removed. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: May _7_, 2012

_____
Thomas D. Warren
Justice, Superior Court

---

[8] The court understands that under the combined effect of the judgment in this case and the judgment in RE-05-169, J-Lot owners may use the easement at all times while authorized Broad Cove Shore Association members who are not J-Lot owners are limited to access during a more limited time period (from 15 min before sunrise until sunset, with the full range of permitted recreational use only from 9 am until sunset). This may present challenges in terms of programming access cards to different schedules and in programming them to track the changing times of sunrise and sunset during the course of the year. The court expects that counsel and all parties will attempt to cooperate on these issues.

**ROBERT FLAHERTY VS HELEN MUTHER**
CASE #: PORSC-RE-2008-00098

--------------------------------------------------------------------------------

SEL VD                              REPRESENTATION TYPE      DATE

**01 003911 ATTORNEY: BITHER, STEPHEN D**
ADDR: 23 AMHERST STREET PO BOX 6762 PORTLAND ME 04103
    FOR: JACQUELINE PIERCE        PL        RTND  04/22/2008
    FOR: RUSSELL PIERCE         PL        RTND  04/22/2008
    FOR: SUSAN HOUSE           3RD P DEF  RTND  07/01/2008
    FOR: DAVID HOUSE           3RD P DEF  RTND  07/01/2008
    FOR: NIAMH COLPITTS         PL        RTND  04/22/2008
    FOR: DAVID MEAGHER         3RD P DEF  RTND  07/01/2008
    FOR: ELLEN MEAGHER         3RD P DEF  RTND  07/01/2008
    FOR: PAULETTE YORK         PL        RTND  04/22/2008
    FOR: TODD COLPITTS          PL        RTND  04/22/2008

**02 002982 ATTORNEY: KANY, WILLIAM**
ADDR: 50 INDUSTRIAL PARK ROAD SACO ME 04072
    FOR: PETER CONNOLLY         3RD P DEF  RTND  07/07/2008

**03 007848 ATTORNEY: MCKEE, WALTER**
ADDR: 133 STATE STREET PO BOX 258 AUGUSTA ME 04332-0258
    FOR: HELEN MUTHER          DEF      RTND  04/23/2008
    FOR: BUFFET COASTAL TRUST       DEF      RTND  04/23/2008
    FOR: PAUL WOODS           DEF      RTND  04/23/2008

**04 001027 ATTORNEY: MCNABOE, THOMAS R**
ADDR: 13 SEA COVE ROAD CUMBERLAND ME 04110
    FOR: MARY ARNOLD          PL        RTND  04/22/2008
    FOR: JOSEPH COTTER         PL        RTND  04/22/2008
    FOR: BARBARA COTTER        PL        RTND  04/22/2008
    FOR: ROBERT FLAHERTY        PL        RTND  04/22/2008

**05 002691 ATTORNEY: PARKINSON, DURWARD**
ADDR: 2 PORTLAND RD, KENNEBUNK ME 04043
    FOR: BETH ELLEN HESS        3RD P DEF  RTND  07/03/2008
    FOR: ROBERT HESS, JR        3RD P DEF  RTND  12/03/2008

**06 003649 ATTORNEY: SPARKS, ANDREW**
ADDR: ONE MONUMENT WAY PORTLAND ME 04101
    FOR: 2005 BROAD COVER SHORE ASSOC.   3RD P DEF  RTND  06/25/2008
    FOR: MERGED BROAD COVE SHORE ASSOC. 3RD P DEF  RTND  06/25/2008
    FOR: NEW BROAD COVE SHORE ASSOC.   3RD P DEF  RTND  06/25/2008

**07 009291 ATTORNEY: FRAME, GREGG R**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: JAMES L MOODY, JR         3RD P DEF   RTND  07/21/2008
    FOR: NORMAN WULF (TRUSTEE)     3RD P DEF   RTND  07/21/2008
    FOR: NANCY WULF              3RD P DEF   RTND  07/21/2008
    FOR: ELIZABETH MCGRATH       3RD P DEF   RTND  07/21/2008
    FOR: STEPHEN MCGRATH         3RD P DEF   RTND  07/21/2008
    FOR: ROBERT HESS, JR           3RD P DEF   RTND  07/21/2008
    FOR: PATRICIA CAMPBELL        3RD P DEF   RTND  07/21/2008
    FOR: MELANIE STEWART         3RD P DEF   RTND  07/21/2008
    FOR: PAUL STEWART            3RD P DEF   RTND  07/21/2008
    FOR: ALISON PERKINS (TRUSTEE)    3RD P DEF   RTND  07/21/2008
    FOR: MARJORIE MOODY         3RD P DEF   RTND  07/21/2008

**08 009353 ATTORNEY: BILLINGS, JAMES A**
ADDR: 227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
    FOR: PAUL WOODS           DEF      RTND  11/05/2008

**09 009872 ATTORNEY: DUCHETTE, ANDRE G**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: ALISON PERKINS (TRUSTEE)    3RD P DEF   RTND  07/21/2008
    FOR: ELIZABETH MCGRATH       3RD P DEF   RTND  07/21/2008
    FOR: 1962 BROAD COVE SHORE ASSOC.   3RD P DEF   RTND  06/25/2008
    FOR: 2005 BROAD COVER SHORE ASSOC.   3RD P DEF   RTND  06/25/2008
    FOR: NEW BROAD COVE SHORE ASSOC.   3RD P DEF   RTND  06/25/2008
    FOR: MERGED BROAD COVE SHORE ASSOC. 3RD P DEF   RTND  06/25/2008

**10 004209 ATTORNEY: HADIARIS, JOSHUA D**
ADDR: 415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600
    FOR: PETER CONNOLLY        3RD P DEF   RTND  01/15/2009

STATE OF MAINE
CUMBERLAND, ss.

ROBERT FLAHERTY, et al,

Plaintiffs

v.

HELEN MUTHER, et al,

Defendants

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-08-98
TDW-Cum-5/10/2012

ORDER

STATE OF MAINE
Cumberland, ss, Clerk's Office

MAY 10 2012

RECEIVED

In its decision at 2011 ME 32, the Law Court remanded the issue of surveillance cameras for a further determination by this court. At the same time the Law Court vacated the trial court's award of costs to allow reconsideration of whether the J-Lot owners were still the prevailing parties in light of the disposition of the appeal and because the award of costs had been entered after Muther and Woods had filed a notice of appeal. 2011 ME 32 ¶¶ 89-90.

Separately, in 2011 ME 34, the Law Court vacated and remanded a separate award of attorney fees to certain J-Lot owners, concluding that the factual basis for the trial court's Rule 37(c) award may change in light of the disposition of the appeal or upon remand. 2011 ME 34 ¶ 11.

Prevailing Parties

Re-evaluating the "prevailing party" issue in light of (1) the result of the original trial, (2) the Law Court's decision on appeal, and (3) the limited issue resolved on remand, the court concludes as follows:

1. As between defendants Muther and Woods and the third party defendants, the third party defendants were the prevailing parties in the original proceeding, and that judgment – that they were not liable for indemnification, fraud, or implied warranty of authority – was upheld on appeal. As far as the court is aware, however, the third party defendants never filed a bill of costs.

2. As between plaintiff J-Lot owners and defendants Muther and Woods, the J-Lot owners ultimately prevailed on the following issues: (1) whether J-Lot owners were bound by the November 2006 settlement agreement between defendants Muther and Woods and the Broad Cove Shore Association, (2) whether the easement could be used for general recreational use, (3) whether use of the easement should be limited to daylight hours, (4) whether J-Lot owners had to accompany their family members and guests in order for the latter to use the easement, (5) whether surveillance cameras would be permitted, and (6) whether the easement would be overburdened unless activity in the intertidal zone were limited to fishing, fowling, and navigation.

3. As between plaintiff J-Lot owners and defendants Muther and Woods, defendants Muther and Woods prevailed in the original proceeding on the following issues: (1) the J-Lot owners' claim to prescriptive rights over upland belonging to Muther and Woods and (2) the issue of whether the easement would be overburdened if used to access the upland belonging to William Holt. On appeal defendants Muther and Woods prevailed on another issue: (3) the access gate.

4. On the only other litigated issue (whether Muther and Woods owned only to the top of the bank or whether they owned the intertidal zone), neither set of parties prevailed because the trial court determined that the boundary was

2

the mean high water line, partway between the position taken by the J-Lot owners and the position taken by Woods and Muther.

5. Based on the above, the court determines that as between the J-Lot owners and defendants Muther and Woods, the J-Lot owners are the prevailing parties and are therefore entitled to costs.

## Further Proceedings

1. A review of the file reveals that plaintiffs Pierce, Colpitts, House, Meagher, and York (the J-Lot owners represented by Stephen Bither Esq.) filed a bill of costs for $ 10,087.78 and also filed a motion for attorneys fees and costs under Rule 37(c) based on Muther and Woods's failure to admit certain matters in response to a request for admissions directed to Muther and Woods under Rule 36.

2. Muther and Woods opposed certain items in the bill of costs and asked for a hearing on those items. Muther and Woods also opposed the motion for costs and attorneys fees under Rule 37(c).

3. Justice Crowley did not hold a hearing but considered the bill of costs and the objections thereto and issued an order on March 16, 2010 awarding costs in the amount of $ 7,045.70. This represented a reduction of more than $3,000 to the award of costs sought by the J-Lot owners.

4. Justice Crowley also considered the J-Lot owners' motion pursuant to Rule 37(c) and the objections filed thereto and on March 16, 2010 issued another order awarding attorney fees as to certain of the denials made in response to the request for admissions and denying fees as to other denials. That order established a schedule under which the J-Lot owners were to submit

3

affidavits supporting the attorney fees they were requesting and Muther and Woods were to submit any objections to the fee request.

5. Thereafter, affidavits and pleadings were submitted on the issue of attorney fees, and on June 24, 2010 Justice Crowley issued an order awarding $16,440 in attorney fees to the J-Lot owners pursuant to Rule 37(c).

6. The Law Court concluded that because an appeal was pending, Justice Crowley lacked jurisdiction to act on the J-Lot owners' bill of costs, although he did have jurisdiction to act on the request for attorney fees under Rule 37(c). 2011 ME 32 ¶ 90; 2011 ME 34 ¶ 8. In light of the remands, however, both of those determinations must be revisited.

7. Within 14 days of the date of this order any parties who wish to be heard on these issues shall file letters or pleadings settling forth their positions on the issue of costs and Rule 37(c) attorney fees. Those shall include their positions on the following issues: (a) whether any new or supplemental applications for costs would be timely or warranted at this stage, (b) whether any further submissions or proceedings are necessary on the issue of costs and Rule 37(c) attorney fees or whether the court can make those determinations based on the previously filed submissions and the existing record, and (c) whether and to what extent they contend that the factual basis upon which Justice Crowley made the Rule 37(c) award has changed in light of the Law Court's decision in 2011 ME 32 or the proceedings on remand. Any party that contends that this court has misunderstood the procedural history set forth above with respect to costs should raise that issue in its submission.

4

The entry shall be:

The J-Lot owners are determined to be the prevailing parties for purposes of the award of costs. Procedural order entered with respect to the issue of costs and Rule 37(c) attorney fees. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: May __10__, 2012

Thomas D. Warren
Justice, Superior Court

5

**ROBERT FLAHERTY VS HELEN MUTHER**
CASE #: PORSC-RE-2008-00098

--------------------------------------------------------------------------------

SEL VD                     REPRESENTATION TYPE     DATE

**01 003911 ATTORNEY: BITHER, STEPHEN D**
ADDR: 23 AMHERST STREET PO BOX 6762 PORTLAND ME 04103

| FOR: | TYPE | | DATE |
|------|------|------|------|
| JACQUELINE PIERCE | PL | RTND | 04/22/2008 |
| RUSSELL PIERCE | PL | RTND | 04/22/2008 |
| SUSAN HOUSE | 3RD P DEF | RTND | 07/01/2008 |
| DAVID HOUSE | 3RD P DEF | RTND | 07/01/2008 |
| NIAMH COLPITTS | PL | RTND | 04/22/2008 |
| DAVID MEAGHER | 3RD P DEF | RTND | 07/01/2008 |
| ELLEN MEAGHER | 3RD P DEF | RTND | 07/01/2008 |
| PAULETTE YORK | PL | RTND | 04/22/2008 |
| TODD COLPITTS | PL | RTND | 04/22/2008 |

**02 002982 ATTORNEY: KANY, WILLIAM**
ADDR: 50 INDUSTRIAL PARK ROAD SACO ME 04072

| FOR: | TYPE | | DATE |
|------|------|------|------|
| PETER CONNOLLY | 3RD P DEF | RTND | 07/07/2008 |

**03 007848 ATTORNEY: MCKEE, WALTER**
ADDR: 133 STATE STREET PO BOX 258 AUGUSTA ME 04332-0258

| FOR: | TYPE | | DATE |
|------|------|------|------|
| HELEN MUTHER | DEF | RTND | 04/23/2008 |
| BUFFET COASTAL TRUST | DEF | RTND | 04/23/2008 |
| PAUL WOODS | DEF | RTND | 04/23/2008 |

**04 001027 ATTORNEY: MCNABOE, THOMAS R**
ADDR: 13 SEA COVE ROAD CUMBERLAND ME 04110

| FOR: | TYPE | | DATE |
|------|------|------|------|
| MARY ARNOLD | PL | RTND | 04/22/2008 |
| JOSEPH COTTER | PL | RTND | 04/22/2008 |
| BARBARA COTTER | PL | RTND | 04/22/2008 |
| ROBERT FLAHERTY | PL | RTND | 04/22/2008 |

**05 002691 ATTORNEY: PARKINSON, DURWARD**
ADDR: 2 PORTLAND RD, KENNEBUNK ME 04043

| FOR: | TYPE | | DATE |
|------|------|------|------|
| BETH ELLEN HESS | 3RD P DEF | RTND | 07/03/2008 |
| ROBERT HESS, JR | 3RD P DEF | RTND | 12/03/2008 |

**06 003649 ATTORNEY: SPARKS, ANDREW**
ADDR: ONE MONUMENT WAY PORTLAND ME 04101

| FOR: | TYPE | | DATE |
|------|------|------|------|
| 2005 BROAD COVER SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |
| MERGED BROAD COVE SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |
| NEW BROAD COVE SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |

**07 009291 ATTORNEY: FRAME, GREGG R**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: JAMES L MOODY, JR              3RD P DEF   RTND   07/21/2008
    FOR: NORMAN WULF (TRUSTEE)          3RD P DEF   RTND   07/21/2008
    FOR: NANCY WULF                     3RD P DEF   RTND   07/21/2008
    FOR: ELIZABETH MCGRATH              3RD P DEF   RTND   07/21/2008
    FOR: STEPHEN MCGRATH                3RD P DEF   RTND   07/21/2008
    FOR: ROBERT HESS, JR                3RD P DEF   RTND   07/21/2008
    FOR: PATRICIA CAMPBELL              3RD P DEF   RTND   07/21/2008
    FOR: MELANIE STEWART                3RD P DEF   RTND   07/21/2008
    FOR: PAUL STEWART                   3RD P DEF   RTND   07/21/2008
    FOR: ALISON PERKINS (TRUSTEE)       3RD P DEF   RTND   07/21/2008
    FOR: MARJORIE MOODY                 3RD P DEF   RTND   07/21/2008

**08 009353 ATTORNEY: BILLINGS, JAMES A**
ADDR: 227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
    FOR: PAUL WOODS                     DEF       RTND   11/05/2008

**09 009872 ATTORNEY: DUCHETTE, ANDRE G**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: ALISON PERKINS (TRUSTEE)       3RD P DEF   RTND   07/21/2008
    FOR: ELIZABETH MCGRATH              3RD P DEF   RTND   07/21/2008
    FOR: 1962 BROAD COVE SHORE ASSOC.   3RD P DEF   RTND   06/25/2008
    FOR: 2005 BROAD COVER SHORE ASSOC.  3RD P DEF   RTND   06/25/2008
    FOR: NEW BROAD COVE SHORE ASSOC.    3RD P DEF   RTND   06/25/2008
    FOR: MERGED BROAD COVE SHORE ASSOC. 3RD P DEF   RTND   06/25/2008

**10 004209 ATTORNEY: HADIARIS, JOSHUA D**
ADDR: 415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600
    FOR: PETER CONNOLLY                 3RD P DEF   RTND   01/15/2009

STATE OF MAINE
CUMBERLAND, ss.

ROBERT FLAHERTY, et al,

Plaintiffs

v.

HELEN MUTHER, et al,

Defendants

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-08-98
*DW-JW- 7/H/2012*

ORDER

STATE OF MAINE
Cumberland, ss, Clerk's Office

JUL. 1 - 2012

RECEIVED

In Flaherty v. Muther, 2011 ME 32 ¶72, 17 A.3d 640, the Law Court remanded an issue involving the reasonableness of certain video surveillance cameras that had been placed by defendants Helen Muther and Paul Woods on a right-of-way that provides access to Secret Beach in Cape Elizabeth. The court's order resolving that issue and entering final judgment was signed on May 7 and docketed on May 9, 2012.[1]

In a subsequent order, signed and docketed on May 10, 2012, the court concluded that the J-Lot owners were the prevailing parties and directed the parties to file further submissions on the issue of costs and Rule 37(c) attorneys fees within 14 days.

On May 21, 2012 defendants Muther and Woods moved pursuant to M.R.Civ.P. 52 for amended and additional findings of fact. That motion was denied on May 23, 2012.

---

[1] The order in question was dated and signed on May 7, was stamped as received by the clerk's office on May 8, and docketed on May 9.

On June 12, 2012 Muther and Woods filed a notice of appeal from the court's order docketed on May 9.[2]

Under the Law Court's prior decision in this case, this court does not have jurisdiction to act on the issue of costs while an appeal is pending. 2011 ME 32 ¶ 90. Moreover, although it would have jurisdiction to act with respect to Rule 37(c) attorney fees, see Flaherty v. Muther ("Flaherty v. Muther II"), 2011 ME 34 ¶ 8, prudence would dictate that all further proceedings on Rule 37(c) attorneys fees should await the outcome of the appeal as well.

The entry shall be:

The court is without jurisdiction to act on the issue of costs and will defer the issue of Rule 37(c) attorneys fees to await the outcome of the appeal. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: July _11_, 2012

Thomas D. Warren
Justice, Superior Court

---

[2] In the meantime both counsel for certain J-Lot owners and counsel for Muther and Woods had filed submissions on the issue of costs and Rule 37(c) attorneys fees. Those submissions on costs took issue in varying degrees with the court's May 10 order, and Muther and Woods also sought to revive their request for costs against the State of Maine as intervenor.

2

**ROBERT FLAHERTY VS HELEN MUTHER**
CASE #: PORSC-RE-2008-00098

------------------------------------------------------------------------

SEL VD                          REPRESENTATION TYPE     DATE


**01 003911 ATTORNEY: BITHER, STEPHEN D**
ADDR: 23 AMHERST STREET PO BOX 6762 PORTLAND ME 04103

| FOR: | Representation | Type | | Date |
|------|------|------|------|------|
| FOR: JACQUELINE PIERCE | PL | | RTND | 04/22/2008 |
| FOR: RUSSELL PIERCE | PL | | RTND | 04/22/2008 |
| FOR: SUSAN HOUSE | 3RD P DEF | RTND | 07/01/2008 |
| FOR: DAVID HOUSE | 3RD P DEF | RTND | 07/01/2008 |
| FOR: NIAMH COLPITTS | PL | | RTND | 04/22/2008 |
| FOR: DAVID MEAGHER | 3RD P DEF | RTND | 07/01/2008 |
| FOR: ELLEN MEAGHER | 3RD P DEF | RTND | 07/01/2008 |
| FOR: PAULETTE YORK | PL | | RTND | 04/22/2008 |
| FOR: TODD COLPITTS | PL | | RTND | 04/22/2008 |


**02 002982 ATTORNEY: KANY, WILLIAM**
ADDR: 50 INDUSTRIAL PARK ROAD SACO ME 04072

FOR: PETER CONNOLLY          3RD P DEF   RTND   07/07/2008


**03 007848 ATTORNEY: MCKEE, WALTER**
ADDR: 133 STATE STREET PO BOX 258 AUGUSTA ME 04332-0258

| FOR: HELEN MUTHER | DEF | RTND | 04/23/2008 |
|------|------|------|------|
| FOR: BUFFET COASTAL TRUST | DEF | RTND | 04/23/2008 |
| FOR: PAUL WOODS | DEF | RTND | 04/23/2008 |


**04 001027 ATTORNEY: MCNABOE, THOMAS R**
ADDR: 13 SEA COVE ROAD CUMBERLAND ME 04110

| FOR: MARY ARNOLD | PL | RTND | 04/22/2008 |
|------|------|------|------|
| FOR: JOSEPH COTTER | PL | RTND | 04/22/2008 |
| FOR: BARBARA COTTER | PL | RTND | 04/22/2008 |
| FOR: ROBERT FLAHERTY | PL | RTND | 04/22/2008 |


**05 002691 ATTORNEY: PARKINSON, DURWARD**
ADDR: 2 PORTLAND RD, KENNEBUNK ME 04043

| FOR: BETH ELLEN HESS | 3RD P DEF | RTND | 07/03/2008 |
|------|------|------|------|
| FOR: ROBERT HESS, JR | 3RD P DEF | RTND | 12/03/2008 |


**06 003649 ATTORNEY: SPARKS, ANDREW**
ADDR: ONE MONUMENT WAY PORTLAND ME 04101

| FOR: 2005 BROAD COVER SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |
|------|------|------|------|
| FOR: MERGED BROAD COVE SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |
| FOR: NEW BROAD COVE SHORE ASSOC. | 3RD P DEF | RTND | 06/25/2008 |

**07 009291 ATTORNEY: FRAME, GREGG R**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: JAMES L MOODY, JR          3RD P DEF  RTND  07/21/2008
    FOR: NORMAN WULF (TRUSTEE)    3RD P DEF  RTND  07/21/2008
    FOR: NANCY WULF              3RD P DEF  RTND  07/21/2008
    FOR: ELIZABETH MCGRATH       3RD P DEF  RTND  07/21/2008
    FOR: STEPHEN MCGRATH        3RD P DEF  RTND  07/21/2008
    FOR: ROBERT HESS, JR          3RD P DEF  RTND  07/21/2008
    FOR: PATRICIA CAMPBELL       3RD P DEF  RTND  07/21/2008
    FOR: MELANIE STEWART        3RD P DEF  RTND  07/21/2008
    FOR: PAUL STEWART           3RD P DEF  RTND  07/21/2008
    FOR: ALISON PERKINS (TRUSTEE)   3RD P DEF  RTND  07/21/2008
    FOR: MARJORIE MOODY        3RD P DEF  RTND  07/21/2008

**08 009353 ATTORNEY: BILLINGS, JAMES A**
ADDR: 227 WATER STREET PO BOX 1051 AUGUSTA ME 04332-1051
    FOR: PAUL WOODS             DEF      RTND  11/05/2008

**09 009872 ATTORNEY: DUCHETTE, ANDRE G**
ADDR: 30 MILK STREET 5TH FLOOR PORTLAND ME 04101
    FOR: ALISON PERKINS (TRUSTEE)   3RD P DEF  RTND  07/21/2008
    FOR: ELIZABETH MCGRATH       3RD P DEF  RTND  07/21/2008
    FOR: 1962 BROAD COVE SHORE ASSOC.   3RD P DEF  RTND  06/25/2008
    FOR: 2005 BROAD COVER SHORE ASSOC.   3RD P DEF  RTND  06/25/2008
    FOR: NEW BROAD COVE SHORE ASSOC.   3RD P DEF  RTND  06/25/2008
    FOR: MERGED BROAD COVE SHORE ASSOC. 3RD P DEF  RTND  06/25/2008

**10 004209 ATTORNEY: HADIARIS, JOSHUA D**
ADDR: 415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600
    FOR: PETER CONNOLLY        3RD P DEF  RTND  01/15/2009

STATE OF MAINE
CUMBERLAND, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-08-98 / 2013
TEH-CUM-11/58

STATE OF MAINE
/Cumberland, ss, Clerk's Office

NOV 20 2013

RECEIVED

ROBERT FLAHERTY, ET AL,

Plaintiffs

v.

ORDER ON BILL OF COSTS

HELEN MUTHER, ET AL,

Defendants

The court is presented with the Bill of Costs submitted by Defendants/Third-Party Plaintiffs Helen Muther and Paul Woods against Intervenor State of Maine. The court will not reprise in detail the many well-chronicled layers of the underlying disputes first begun in 2005 other than as may inform issues related to the Bill of Costs.

## BACKGROUND

Since 2005, Muther and Woods have been involved in extensive litigation concerning a right-of-way and easement rights with respect to a parcel of coastal real property owned by them, individually and as trustees of the Buffett Coastal Trust, in Cape Elizabeth, Maine.[1]

In 2008, the owners of 18 neighboring lots ("J–Lot owners") and the Broad Cove Shore Association brought an action against Muther and Woods. In turn, Muther and Woods filed counterclaims and a third-party complaint against all of the J-Lot owners and the Association.

---

[1] In November 2005, Muther and Woods brought an action against a homeowners association and two individuals concerning disputed rights to easement areas on Muther and Woods's property. In the course of the lawsuit, the parties entered into a settlement agreement that, in turn, generated yet another dispute. As a result, Muther and Woods amended their complaint seeking to enforce the settlement agreement and to clarify the scope of the easements on their property. On appeal, the Law Court upheld the settlement agreement. *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, 968 A.2d 539.

1

The case centered on the easement and prescriptive rights affecting Muther and Woods's property.[2] *Flaherty v. Muther*, 2011 ME 32, 17 A.3d 640.

On December 2, 2008, the State of Maine was allowed to intervene for the limited purpose of protecting "the public trust rights in the intertidal land" in front of Muther and Woods's property. *Flaherty*, 2011 ME 32, ¶¶ 20 & 86, 17 A.3d 640. On May 26, 2009, the State filed a motion to amend its "pleadings"[3] by adding a "counterclaim" in the nature of a declaratory judgment seeking a determination of the prescriptive rights of the J-Lot owners and the public in that intertidal area. In its motion to amend, the State articulated its limited purpose for wanting to be part of this case,

> [T]he State intervened in this matter to preserve and be heard upon the public trust issues [referenced in Muther and Woods's Counterclaims and Third-Party Complaint], to the extent they may be reached, and has not conducted or been involved in the discovery process.

(State's Mot. For Leave To Amend 2 (May 21, 2009).) Muther and Woods objected to the State's intervention.

The State's motion was granted on June 23, 2009.[4] At the heart of it, the State urged the court to declare that, under the Maine Public Trust Doctrine, the public, including the J-Lot owners, have the right to use the intertidal land for general recreational purposes not limited to

---

[2] Although this 2008 case was not part of the first action filed in 2005, it was for all intents and purposes a new chapter in the continuing disputes concerning the easement rights affecting Muther and Woods's property. The 2008 case included various counterclaims, cross-claims and third-party claims, which, in turn, have spawned several Law Court decisions. *Flaherty*, 2011 ME 32, 17 A.3d 640; *Muther v. Broad Cove Shore Association*, 2011 ME 33, 25 A.3d 965; and *Flaherty v. Muther*, 2013 ME 39, 65 A.3d 1209.

[3] Technically, the State had not filed a pleading that could be amended. A review of the court's file reflects that the State had only filed a motion to intervene and an accompanying statement of facts.

[4] As noted, the pleading filed by the State pursuant to the Court's granting of its motion to amend was styled a "counterclaim". While this may have been intended as a counterclaim to Plaintiff Robert Flaherty's complaint, it was more likely directed to Muther and Woods's Counterclaim and/or their Third-Party Complaint, both of which included references to the intertidal zone in front of Muther and Woods's property. In any event, no party filed a responsive pleading to the State's counterclaim.

2

fishing, fowling and navigation. Muther and Woods did not file an answer or objection directed to the State's counterclaim; rather, they filed a statement of facts in response to the State's statement of facts.

The trial court held a non-jury trial from July 14, 2009 through July 23, 2009, regarding some but not all of the parties' various claims, counterclaims, cross-claims and third-party claims. On July 30, 2009, the court issued its findings and judgment. *Flaherty v. Muther*, CUMSC-RE-08-98 (Me. Super. Ct., Cumb. Cty., July 30, 2009) ("July 30, 2009 Judgment"). In this phase of the case, the court first disposed of the disputes among the private parties. It then separately addressed the State's issue of "whether J-Lot owners have rights to recreate in the intertidal zone under Maine's Public Trust Doctrine." July 30, 2009 Judgment at 25. Muther and Woods had argued that the court should not decide the public trust claim because the State failed to join an indispensible party — to wit, the actual owner of the intertidal land in question. *Id.* The trial court rejected Muther and Woods's argument, *Id.*, and also "rejected the State's claim to expand the public trust rights in intertidal lands to include general recreational uses." *Flaherty*, 2011 ME 32, ¶ 26, 17 A.3d 640.

The parties filed various appeals and cross-appeals to the Law Court that included, among other things, the State's cross-appeal from the trial court's determination "that the public's rights to use the intertidal land in front of Muther and Woods's property are limited to fishing, fowling, and navigation." *Flaherty*, 2011 ME 32, ¶ 2, 17 A.3d 640.

Addressing the State's cross-appeal, the Law Court first observed that Woods and Muther did not hold title to the intertidal land in question and that the owner had not been joined as a party in the litigation. *Flaherty*, 2011 ME 32, ¶ 88, 17 A.3d 640. However, the Law Court did not cast this as a failure by the State, alone, to join an indispensible party. Rather, it noted that

3

"the *parties* did not join the owner of the intertidal land as a party to this action. *Id.* (emphasis added)[5]

The Law Court also affirmed the trial court's judgment that "the J-Lot owners may use the easement [on Muther and Woods's property] to access the intertidal land for *general recreational purposes*" because the owner of intertidal zone land gave them that right. *Id.* (emphasis added). From that premise, the Law Court reasoned that "a [separate] determination of whether the public may use the intertidal land for general recreation will not affect the J-Lot owners permitted use of the easement." *Id.* Thus, the Law Court did not need to reach the State's public trust claim because, as the court concluded, Muther and Woods did not have an interest in contesting that claim and there was no justiciable controversy. *Id.*

On January 10, 2010, while the appeals and cross-appeals were pending, Muther and Woods filed the Bill of Costs that is the subject of this order. (Muther & Woods' Bill of Costs, Jan. 7, 2010.) The Bill of Costs is purportedly directed to all of the parties in the action, but does not specifically refer to the State or its claim. All issues, including the matter of costs as between Woods and Muther and the J-Lot owners and the Broad Cove Shore Association have been resolved. The only issue now remaining in this case is Muther and Woods's Bill of Costs insofar as it applies to the State.

---

[5]     While this is accurate, it is also the case that the trial court neither accepted Muther and Woods's argument that the owner of the intertidal area in question should have been joined as an indispensible party, nor ordered such joinder. *See* M.R. Civ. P. 19(a) ("If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant.")

It is interesting to note that in one foreclosure appeal, the Law Court vacated the trial court's decision and remanded for the joinder of a necessary party. *OCWEN Federal Bank, FSB v. Gile*, 2001 ME 120, ¶1 ("Because the Town is a necessary party to determination of its ownership interest in the property, we vacate and remand to join the Town as a party so that it may participate fully in the trial court proceedings.") It may be a distinguishing fact that in *OCWEN*, the Town was aware of the foreclosure lawsuit from its inception. There is no indication in the instant case whether the owner of the intertidal land in front of Muther and Woods's property knew of this litigation.

4

The Maine Rules of Civil Procedure provide that "[c]osts shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs." M.R. Civ. P. 54(d). To determine whether a party has prevailed, the court applies a "functional analysis, rather than a mechanical application of [the rule governing costs]" and "must look at the lawsuit as a whole to determine which party was the 'winner' and which the 'loser.'" *Dodge v. United Serv.s Auto. Ass'n.*, 417 A.2d 969, 974-75 (Me. 1980) (citation omitted); *see also Landis v. Hannaford Bros. Co.*, 2000 ME 111, ¶ 6, 754 A.2d 958, 959.

Woods and Muther argue that they should be awarded costs against the State because the State did not prevail in this case and, in particular, because Muther and Woods successfully kept the so-called "Secret Beach" private despite the efforts of the State. However, the Law Court did not reach the issue of whether Secret Beach is or should remain private. As noted, the Law Court concluded and correctly declared that

> Although Muther and Woods may still challenge uses of the intertidal land of Secret Beach to the extent that those uses overburden the easement [on their property], because we affirm the court's judgment declaring that the J–Lot owners may use the easement to access the intertidal zone for general recreational purposes, a determination of whether the public may use the intertidal land for general recreation will not affect the J–Lot owners' permitted use of the easement. As a result, Muther and Woods no longer have 'an interest in contesting the [State's] claim.' Absent a justiciable controversy, we lack authority to address this issue.

*Flaherty*, 2011 ME 32, ¶ 88, citations omitted. In the absence of an indispensible party — to wit, the owner of the intertidal land — the Law Court held that it did not have jurisdiction over the issue and, by implication, neither did the Superior Court. *See* M.R. Civ. P. 19(b).

Viewing the entirety of this litigation and its subparts, the court cannot conclude that, as to the claims between Muther and Woods and the State, either party prevailed over the other.

5

First, as to the general recreational rights of the J-Lot owners in the intertidal area in front of Muther and Woods property, while the State's position was certainly aligned with the successful claim of the J-Lot owners, it is more than a little difficult to view the State as the prevailing party on that issue for the purpose of Rule 54(d). And second, as to the State's public trust claim, since the court did not have jurisdiction to hear and decide that issue, a circumstance not specifically attributed to one party or the other, there is no prevailing party. And, because neither party prevailed, there can be no award of costs. *See* M.R. Civ. P. 54(d); 14 M.R.S. 1501 (2013).

## CONCLUSION

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this order into the docket by reference and the entry is

> Muther and Woods's Bill of Costs as to the State of Maine is not allowed and the Motion for Costs is DENIED.

Dated: November 20, 2013

_____
Thomas Humphrey, Chief Justice
Maine Superior Court

6

007848 ATTORNEY: MCKEE, WALTER
ADDR: 133 STATE STREET AUGUSTA ME 04330
    FOR: HELEN MUTHER              DEF      RTND  04/23/2008
    FOR: PAUL WOODS               DEF      RTND  04/23/2008
    FOR: BUFFET COASTAL TRUST    DEF      RTND  04/23/2008

002310 ATTORNEY: STERN, PAUL
ADDR: 6 STATE HOUSE STATION AUGUSTA ME 04333-0006
    FOR:STATE OF MAINE          INTRV  RTND  10/15/2008